## SAMUEL R. MAYNARD, Appellant, v. DOE RUN LEAD COMPANY.

### Division Two, October 10, 1924.

1. **CORPORATION: Increase of Stock: Treasury Stock: Prorated.** Treasury stock is stock belonging to the corporation and subject to sale by it. If used as a stock dividend, it must be issued to the stockholders in proportion to the amount of stock held by each; if sold, the money goes into the company's treasury. In either event, it does not change the stockholder's pro rata interest in the company's assets.

2. ———: ———: ———: ———: **Preserving Interest of Stockholder.** The capital stock of a corporation was $4,000,000, represented by 40,000 shares of the par value of one hundred dollars each. After notice of the date of a meeting and its purpose, the stockholders adopted a resolution to the effect that, inasmuch as the assets of the company in excess of its liabilities were more than ten million dollars, the surplus assets be converted into increased stock, and that the board of directors be authorized to set apart six million dollars out of the surplus assets for the payment in full of the increased capital stock "and that the said increased stock so paid be retained in the treasury as treasury stock, either to be sold from time to time for the benefit of the company, or distributed pro rata among the stockholders as a stock dividend, or both, at the discretion of the board of directors." The board adopted a resolution that the surplus be "devoted and applied to the full payment of 60,000 shares of the capital stock" and that "a pro rata stock dividend of fifty per cent of the outstanding capital stock be hereby declared to stockholders" and that "the balance of said increased stock be retained in the treasury as treasury stock, to be either sold from time to time for the benefit of the company, or distributed pro

rata among the stockholders as a stock dividend." The outstanding stock at the time was 30,375 shares, 625 of the 40,000 shares being unissued. In pursuance to these resolutions 19,687 shares were distributed among the stockholders as a stock dividend, making 59,062 shares then outstanding. Plaintiff was the owner of 652 shares, and 326 additional shares were prorated and issued to him as a stock dividend. Of the treasury stock 5,906 shares were sold and the purchase money paid into the treasury The result is that there are 65,783 shares outstanding, and 34,127 remain in the treasury unissued. Plaintiff claims that, not being present when the stockholders' resolution was adopted and not having received notice of their meeting, he was entitled not only to the 326 shares as a stock dividend, but in addition to one and a half times the 652 shares he already had and the 326 dividend stock shares, or 1467 shares of the treasury stock, making in all 2445 shares, his theory being (a) that when the stock was increased and the increase paid out of the surplus assets, immediately each stockholder became entitled to a certificate of stock equal to his proportion of said increase, and that neither the stockholders participating in the meeting at which the increase was voted, nor the board of directors, had any authority to declare the pro rata increase of the non-participating stockholders to be treasury stock, and (b) that the stockholders who voted to turn the stock over to the treasury thereby donated their portions of the increase to the company as treasury stock, and as they held 27,000 of the outstanding 40,000 shares they donated 40,500 shares to the company, which should be issued to the other stockholders as fully paid up. *Held*. that plaintiff received the number of shares to which he was entitled, and the entire number now held by him, namely, 978 shares, represent his pro rata interest in the company's assets, in its unissued treasury stock, and in the money in the treasury for which the 5,906 shares of treasury stock were sold.

3. ———: ———: **Suit for Treasury Stock: Limitations: Fraud.** The statute (Sec. 1317, R. S. 1919) providing that in any action for relief upon the ground of fraud a cause of action shall not be deemed to have accrued until the discovery of the fraud, has no application to a cause of action in which relief is not asked upon the ground of fraud. If plaintiff's suit is one to compel a corporation to issue to him a certain amount of its treasury stock, created at the time its stock was increased in an amount equal to its surplus assets, his cause of action, if any, arises out of the legitimate transactions of the company, and is not based on a fraudulent increase of stock or other fraud, and said statute does not apply.

4. ———: ———: ———: ———: **Suspension: Concealment: Igno-rance.** Section 1334, Revised Statutes 1919, suspends the running of the Statute of Limitations, where by some improper conduct, such as a concealment of the true state of affairs, defendant has prevented the commencement of the action; but the mere ignorance of the party complaining, or the silence of the defendant, does not amount to actionable concealment. Where plaintiff sues to compel a corporation to issue to him a claimed pro rata amount of the increase of its stock, equal to its surplus assets, authorized by the holders of a majority of its stock, at a meeting at which he was not present, and set aside as treasury stock, it is necessary for him to show, in order to prevent the Statute of Limitations from running and to bring himself within the provisions of said Section 1334, not only that his rights were unknown to him, but were purposely concealed from him by the officers of the company.

5. ———: ———: ———: ———: ———: **Constructive Notice.** The statement of the increase of the capital stock of a corporation, duly certified to the Secretary of State, and filed for record in the office of the Recorder of Deeds of the proper county, and duly filed in the office of the Secretary of State, showing an increase of the capital stock from $4,000,000 to $10,000,000, divided into 100,000 shares of the par value of one hundred dollars each, full paid, and that such increase was equal to the surplus assets of the company, constituted constructive notice to a stockholder who claims his pro rata share of the reserved increased treasury stock was not issued to him, and such constructive notice is conclusive upon him as to just what was done with the increase and his particular right to compel the company to issue to him a claimed portion of it, and makes unavailing his plea of fraudulent concealment as an operative suspension of the Statute of Limitations, unless what the officers and directors of the company told him misled and deceived him and his reliance thereon excused his failure to search the records for what was done.

6. **CONCEALMENT: Constructive Notice: Fiduciary Relation: Deception: Reliance.** A stockholder cannot evade the effect of constructive notice of the acts of a corporation in increasing its capital stock, by an assertion that its officers and directors were trustees for its stockholders and sustained a fiduciary relation to them, that he had a right to reply upon what they told him, that their statements misled and deceived him and prevented a search of the recorded instruments, if the facts show that he was not misled or deceived, that there were no misrepresentations, and that he did in fact examine the records, and they revealed to him every fact upon which he bases his claim for a larger pro rata share of the treasury stock than was given to any other stockholder when the capital stock was increased.

Maynard v. Doe Run Lead Co.

7. ———: **Knowledge of Agent.** The information of a public accountant employed to examine the books of a corporation is the information of his employer, and the knowledge the examiner acquired by such examination is the knowledge of the employer.

8. ———: **Limitations: Actual Knowledge.** A suit to compel a corporation to issue to a stockholder a claimed pro rata share of the increase of its capital stock is barred in five years after the cause of action accrued; and where the increase was made in 1906, and plaintiff had actual knowledge of it in May, 1915, his cause of action begun in November, 1920, was barred.

9. ———: **Increase of Capital Stock: Actual Knowledge: Derived from Recitals in Certificates.** Plaintiff's wife acquired 652 shares of the capital stock of a corporation at different dates; they bore different dates and showed several increases of the capital stock; two of them at least were for stock dividends; two of them, one for 124 shares issued in May, 1905, and another for 279 shares issued in January, 1906, showed the capital stock to be $4,000,000 and 40,000 shares. In April, 1906, at a stockholders' meeting of which she did not receive notice, the capital stock was increased from $4,000,000 to $10,000,000, and in June she received a stock dividend for 326 shares, which showed the capital stock to be $10,000,000 with 100,000 shares. The plaintiff knew all about her business and knew that she had not received notice of the meeting. She died in 1907, and by her will bequeathed her stock to plaintiff, and he had her several certificates canceled and in lieu of them caused one certificate for 976 shares to be issued to him, and it recited a capital stock of $10,000,000 and 100,000 shares. He sues to compel the company to issue to him 1467 shares of the increased stock held in the treasury. *Held*, that his own certificate of stock, especially when compared with the three certificates of stock dividends issued to her, shows that he had actual notice of the increase in the capital stock made in 1906, and that the increase was paid out of the assets of the company, and his suit begun in 1920 is barred by limitations.

Headnotes 1 and 2, Corporations: 1, 14 C. J. pars. 554, 1240; 2, 14 C. J. pars. 1234, 1240. Headnotes 3 to 6 and 8 to 9: Limitation of Actions: 3, 25 Cyc. 1182; 4, 25 Cyc. 1212, 1215, 1218; 5, 25 Cyc. 1216; 6, 25 Cyc. 1222; 8 and 9, 25 Cyc. 1211. Headnote 7: Agency, 2 C. J. par. 542.

Appeal from St. Francois Circuit Court. — *Hon. Peter H. Huck*, Judge.

Affirmed.

*Warner, Dean & Thompson* for appellant.

(1)   The increase of the capital stock in 1906 belonged to the stockholders in proportion to their holdings.   It did not belong to the corporation and was not subject to its control.   Sec. 20, Art. 2, Mo. Constitution; Knapp v. Publishers, Geo. Knapp & Co., 127 Mo. 53; Stokes v. Continental T. Co., 186 N. Y. 285; Gibbons v. Mahon, 4 Mackey, 130, 136 U. S. 569; Lynch v. Turrish, 236 Feb. 653; Eisner v. Macomber, 253 U. S. 189; Rand v. Hubbell, 115 Mass. 461; U. S. Radiator Corp. v. State, 208 N. Y. 149.   (2)   A stockholder is entitled to preserve his pro rata interest in the corporation.   Stokes v. Continental Trust Co., 186 N. Y. 285; Jones v. Concord & Montreal Railroad, 67 N. H. 119; 14 C. J. 395; Gray v. Portland Bank, 3 Mass. 364; Jones v. Morrison, 31 Minn. 140.   (3)   Appellant's right to the stock dividend upon the stock vesting by virtue of the increase of capital stock is established at directors' meeting of May 10, 1906. Hill v. Atoka Coal Co., 21 S. W. 508; 14 C. J. p. 813; Stokes v. Continental Trust Co., 186 N. Y. 285.   (4)   The shares of stock created at the time of the increase were duly issued. Wilson v. Mercantile Co., 167 Mo. App. 324; Crosley v. Stratton, 17 Colo. App. 213. (5)   Certificates for shares of stock are merely the evidence of ownership. Williams v. Everett, 200 S. W. 1050; Pacific Natl. Bank v. Eaton, 141 U. S. 227; Flour City Bank v. Shire, 84 N. Y. Supp. 810; Field v. Pierce, 102 Mass. 253.   (6)   Appellant is not barred from recovery by any laches, acquiescence or statute of limitations.   Bent v. Priest, 86 Mo. 475; Bent v. Priest, 10 Mo. App. 543; Hannerty v. Standard Theater Co., 109 Mo. 297; Chicago Railway v. Des Moines Railway, 254 U. S. 196; Citizens' Savings & Trust Co. v. Illinois Central, 182 Feb. 613; State ex rel. Bankers Life v. Reynolds, 277 Mo. 14; Williams v. Everett, 200 S. W. 1050; Doyle v. St. Ry. Co., 113 Mo. 287.

*Nagel & Kirby* and *Edward A. Rozier* for respondent.

(1)   The corporation, not its stockholders, owns the property of the corporation, including both the assets that represent its capital, and the assets that represent its surplus; stockholders own merely their respective proportionate right to participate in corporate acts to the extent permitted by statute, to receive dividends out of net earnings when declared by the board, and upon liquidation to receive their proportionate share of the net assets remaining after the payment of liabilities. Humphreys v. McKissock, 140 U. S. 304; Lynch v. Hornby, 247 U. S. 339; 14 C. J. pp. 381, 382; Bent v. Hart, 10 Mo. App. 143, 73 Mo. 641; Ins. Agency Co. v. Blossom, 231 S. W. 638.   (2)   When a Missouri business corporation authorizes an increase in its capital stock in order that such increase may be paid for out of surplus and "retained in the treasury as treasury stock, to be either sold by the directors for the benefit of the company or distributed as stock dividends, or both, at the discretion of the board," and the board of directors thereupon pays such increase out of surplus and votes to retain the new shares as treasury stock, such new shares remain the property of the corporation until disposed of by its board, and do not forthwith become the individual property of the stockholders. (3)   The construction sought to be given by appellant to the resolutions relating to the new stock in controversy, violates the established rules of construction, and is contrary to the clearly expressed intent of the parties. Donovan v. Boeck, 217 Mo. 87; Kreitz v. Egelhoff, 231 Mo. 703; 2 Elliott on Contracts, secs. 1505, 1510, 1514, 1521; Leschen v. Mayflower, 173 Fed. 855.   (4) Appellant's contention that the stockholders represented at said meeting of April, 1906, donated their interests in said 60,000 new shares of stock to the unrepresented minority, is not supported by either the

facts or the law. Said contention is contrary to the facts, because it is not in accord with the expressed intent of the parties. Said contention is contrary to the law, because "the intent to donate" is essential in law to a valid donation and such intent was lacking in the case at bar. Albrecht v. Slater, 233 S. W. 8; In re Estate of Soulard, 141 Mo. 657; Harding v. Trust Co., 276 Mo. 136; Thomas v. Thomas, 107 Mo. 463; Harris Banking Co. v. Miller, 190 Mo. 640; 20 Cyc. 1195. (5) Appellant's claim is barred by limitation, laches, acquiescence, estoppel and waiver. (a) Appellant's claim is barred by the five-year Statute of Limitations and by laches. His claim is based on actions taken and recorded at stockholders' and directors' meetings held prior to June 1, 1906. This suit was filed November 9, 1919, more than thirteen years after his alleged cause of action arose. More than five years before this suit was filed, the corporation had openly asserted and evidenced its ownership of 60,000 shares of new stock as treasury stock, and had expressly retained it for future corporate purposes and use. R. S. 1919, sec. 1317; Johnson v. United Rys. Co., 243 Mo. 297; Kimbell v. Hydraulic Co., 119 Fed. 105; Callan v. Callan, 175 Mo. 346; Shelby Co. v. Bragg, 135 Mo. 291; Wood v. Carpenter, 101 U. S. 135; Stark v. Zehnder, 204 Mo. 442; Bank v. Thayer, 184 Mo. 61. (b) Where the attitude of a corporation is openly hostile to the alleged preemptive right of a stockholder, he need not even make demand for participation, because his alleged cause of action accrues at once. 14 C. J. par. 537, p. 401. (c) This is in harmony with the rule that even in case of an express continuing trust, a repudiation by the trustee starts the running of the Statute of Limitations. Keeton v. Keeton, 20 Mo. 530; Poe v. Domec, 54 Mo. 119; Johnson v. United Rys. Co., 243 Mo. 278; Bollman v. Peake, 96 Mo. App. 253. (d) A stockholder who claims a preemptive right to subscribe for increased stock, must affirmatively assert such right within a reasonable time. If he fails

to do so, he thereby abandons or waives the right; and if he stands idly by while the stock is being disposed of in denial of his right, he is barred by acquiescence. Cook on Corp. (7 Ed.) sec. 286, p. 829; 14 C. J. p. 398, par. 530; Gray v. Portland Bank, 3 Mass. 388; St. Croix Lumber Co. v. Mittlestadt, 43 Minn. 91; Stoddard v. Decatur Co., 184 Ill. 53; Terry v. Eagle Lock Co., 47 Conn. 165; Shellenberger v. Patterson, 168 Pa. St. 39; Keeney v. Converse, 99 Mich. 316; Crosby v. Stratton, 17 Colo. App. 212. (e) The rule of laches applies in this State to suits by stockholders attacking corporate transactions, or attacking the acts of a majority as violative of minority stockholders. Burgess v. St. Louis County Ry. Co., 99 Mo. 496; Johnson v. United Rys. Co., 243 Mo. 278; Loomis v. Mo. Pac., 165 Mo. 469. (f) There was no concealment sufficient to arrest the Statute of Limitations, or the rule of laches, as fully shown by the evidence. Shelby County v. Bragg, 135 Mo. 291; Loomis v. Mo. Pac. Ry., 165 Mo. 469; Johnson v. United Rys., 243 Mo. 278; State ex rel. v. Yates, 231 Mo. 276; Feld v. Roanoke Inv. Co., 123 Mo. 603; Kimbell v. Chicago Hyd. Co., 119 Fed. 102.

WHITE, J.—The plaintiff, a stockholder in the defendant corporation, seeks by this suit to compel the issuance to him of certificates of stock to which he claims he is entitled by virtue of an increase of the capital stock.

The Doe Run Lead Company originally was incorporated in 1886, with a capital stock of $200,000. In 1888 the stock was increased to $500,000; in 1891 to $750, 000; in 1898 to $1,500,000; in 1903 to $4,000,000. In 1906 the capital stock was increased from $4,000,000 to $10,000,000. The increase in 1898 and the increase in 1902, each, was on account of net surplus assets of the company, as was the last increase, April 24, 1906. The last increase gave rise to the claim upon which plaintiff sues.

After notice of the date of meeting and its purpose, the stockholders owning a majority of the stock in said

company, April 24, 1906, passed a resolution to the effect that inasmuch as assets of the company in excess of its liabilities, as shown by its books, were more than ten million dollars, it was desired to convert the surplus as-, sets into increased stock. Accordingly the increase was voted and certification of the fact duly made to the Secretary of State. The six-million-dollar surplus in the assets of the company was due to increase in the value of land held by the company on account of discovery of additional ore bodies. Before the last increase the capital stock was divided into forty thousand shares of one hundred dollars each. The increase added sixty thousand shares, so that after the increase the capital stock of the company was ten million dollars, divided into one hundred thousand shares of one hundred dollars each.

The stockholders at that meeting passed a resolution authorizing the directors to set apart six million dollars out of the surplus assets for the payment in full of the increased capital stock, ''and that the said increased stock so paid be retained in the treasury of this company as treasury stock, either to be sold from time to time by the directors for the benefit of the company, or distributed pro rata among the stockholders as a stock dividend, or both, at the discretion of the board of directors, and at such times as the board may decide that such action will be to the best interests of the company.''

On May 10, 1906, the board of directors held a meeting and passed a resolution, as follows:

''Whereas, the assets of this company in excess of its liabilities, and as shown by its books, are now over ten million dollars, leaving a surplus of $6,767,120.66; and,

''Whereas, in the judgment of the board of directors, it is for the best interests of the company that such surplus not be distributed in kind among the several stockholders, but should remain a part of the capital of the company, to be used in the further development of its business, and to be applied on account of the payment of the additional increased stock, authorized by the stockholders on April 24, 1906:

"Now, therefore, resolved, That out of the said surplus, the sum of six million dollars be, and the same is hereby, devoted and applied to the full payment of 60,000 shares of the capital stock of this company, being the entire amount of increase of stock authorized by a meeting of the stockholders of this company held on April 24, 1906.

"Resolved, That a pro rata stock dividend of fifty per cent of the outstanding capital of this company on June 1, 1906, be hereby declared to stockholders of record on that date, and that the officers of the company be authorized to issue, and the New York Trust Company be authorized to register, the issue of said stock."

The board of directors also adopted the following resolution:

"Resolved Further, That the balance of said increased stock be retained in the treasury of the company as treasury stock, to be either sold from time to time by the board of directors for the benefit of the company, or distributed pro rata among the stockholders as a stock dividend, or both, at the discretion of the board of directors, and at such times as the board may decide that such action will be to the interests of the company."

In pursuance of that resolution a stock dividend of fifty per cent of the outstanding stock was paid June 1, 1906.

The outstanding stock at the time was 39,375 shares, 625 of the 40,000 shares authorized being unissued. So, 19,687 shares were distributed that date as a stock dividend, making 59,062 shares then outstanding. Those figures should be kept in mind.

The plaintiff bases his right to recover on the theory that when the capital stock was increased and the increase paid for out of the surplus assets of the company, immediately each stockholder became entitled to a certificate for a share of stock representing his proportion of said increase, and neither the stockholders participating in the meeting at which the increase was voted, nor the

board of directors, had any authority to make a different disposition of the increase so far as it affected the stockholders not present and voting at the meeting.

Plaintiff's petition sets out the history of the corporation, showing the different increases of capital stock, including the increase of 1906, paid for out of the assets of the company; alleges that Marion W. Maynard, plaintiff's predecessor in title at the time of the increase, owned 652 shares of stock in the company, fully paid; that by virtue of the two and a half times increase of the original capital stock she became entitled to one and a half times as many additional shares as she already had; that is, 978 additional shares. The petition further recites the action of the board in declaring the stock dividends to be distributed June 1, 1906, whereby she acquired 326 additional shares of stock, and alleges that by reason of that holding she was entitled to certificates representing in addition one and a half times that amount, or 489 shares. The prayer for relief demands the issuance of certificates evidencing the ownership in plaintiff of 978 shares and 489 shares.

The petition alleges that the defendant company and its officers and directors from time to time have made conflicting statements and misrepresentations whereby they sought to conceal the true facts as to the real ownership of the 60,000 shares increase; that the defendant company and its officers and directors now claim that the company has outstanding only 65,783 shares of full-paid stock, and the true facts are that there are outstanding 100,000 shares of stock, and they have illegally withheld issuing certificates representing 34,217 remaining shares of stock. It is further alleged that the stockholders attending the meeting April 24, 1904, who held more than 27,000 of the 40,000 shares of stock then outstanding, donated approximately 40,500 shares of stock to the company; that this stock became treasury stock.

The theory of that last allegation is that, by voting to turn the stock over to the treasury, those voting at the

meeting donated their portions of the increase to the company as treasury stock; while those not voting at the meeting, holding approximately 13,000 shares, were not bound by that action and were entitled to their proportions of that treasury stock, about 19,500 shares. It is claimed in this connection that the stock dividend paid June first following the meeting was paid out of the treasury stock so donated.

The petition alleges that the paintiff is the holder of 1100 shares of stock, having bought 122 shares besides the 652 originally owned, and 326 dividend declared.

The plaintiff seeks to avoid the bar of the Statute of Limitations, or the failure of his suit on account of laches, by alleging fraud and concealment on the part of the officers of the company so as to keep him and his predecessor in title in ignorance of the true condition of the company of the disposition of the stock and the number of shares outstanding, etc.

The answer of the defendant also sets out the history of the corporation, the several increases of the capital stock, and recites at length the proceedings at the stockholders' meeting and at the meeting of the board of directors May 10, 1906, and the distribution of 19,687 shares as stock dividends, being then fifty per cent of the stock outstanding. It further alleges that in July, 1906, 5906 shares of the unissued stock held as treasury stock were sold, each stockholder being granted the right and opportunity to subscribe and pay for a ratable part of the same; that the plaintiff, in response to the invitation, purchased his proportion, 98 shares, and then bought 24 shares in addition, making his total purchase 122 shares. That sale made a total of 65,783 shares issued, leaving 34,217 other shares of unissued stock in the treasury of the company.

The answer also pleads the five-year Statute of Limitations, laches, and waiver by plaintiff of his alleged right to the stock sued for, and sets out the particular facts which would give actual notice to the plaintiff and put

him upon inquiry as to the exact situation in relation to the unissued stock and the claim of the company that it was treasury stock, so as to put in operation the Statute of Limitations.

The petition and the answer, both of great length, differ a little as to the actual facts alleged. The plaintiff filed a reply to the answer, also of great length, which sets up more in detail the facts and circumstances which the plaintiff claims show concealment from him of the condition of the company.

The evidence in the case is quite voluminous, the record comprising more than eight hundred pages. The evidence consists mainly of records and documents, reports, etc., and considerable oral testimony. There is little dispute about the facts. The difference between the parties turns mainly upon the *interpretation* of the facts and the legal effect of the proceedings of the company. The plaintiff had been in litigation with the company in various other suits, more or less of the records of which appear in the record here. Two suits were brought by him in the United States District Court; one in 1915, and one in 1913. Also a suit was brought in the name of the company against Maynard, the plaintiff here, and others, seeking to dissolve the corporation, and the circuit court adjudged the dissolution. That case was appealed to this court and appears reported in 283 Mo. 646, where the judgment of the circuit court was reversed. A considerable part of the record in that case was introduced in this case. Among other things, the plaintiff claims that certain family groups of stockholders were seeking to obtain control of the stock with a view to consolidating with the St. Joseph Lead Company, a corporation which operated and owned mines in the neighborhood of those owned by the Doe Run Company. It appears that much of the trouble causing the various suits referred to was the result of an attempt of the stockholders in the St. Joseph Company to absorb the Doe Run Company. A large part, if not a majority, of the stock of the Doe Run Company

was held by stockholders of the St. Joseph Company; plaintiff himself held some stock in the latter company. The dissolution suit was reversed for the reason that, while it was in form a proceeding to dissolve the corporation, the real purpose was to perfect a consolidation with the St. Joseph Company. All this is stressed at some length by the appellant in an attempt to show an unfair advantage attempted to be taken of him by the majority stockholders.

From what appears in this record, this alleged attitude of the majority stockholders does not affect the question presented for determination here. We are not concerned with the purposes of the majority stockholders; we are concerned only with what they did and the effect of what they did. In so far as the record shows, the desire to consolidate the two companies had nothing to do with the increase of capital stock.

The particular facts claimed by the appellant to remove the bar of limitations, laches, waiver, etc., will be noticed more particularly in considering the defenses of those grounds.

The case was tried in the Circuit Court of St. Francois County, and June 15, 1922, a judgment was rendered for the defendant. The defendant in due form and in due time appealed.

I. Plaintiff's theory is that the increase of capital stock in 1906 belonged to the stockholders in proportion to their holdings; did not belong to the corporation; that his right to his proportion of such stock vested by virtue of the action taken by the stockholders when the increase was voted.

The theory of the defendant is that the stockholders voting at the meeting for the increase, and the board of directors, had authority to determine the disposition of the increased capital stock; that a stockholder could not claim a proportionate share of such increase without some

305 Mo.—24.

definite act of the board of directors declaring a stock dividend.

In this connection the argument largely turns upon what is meant by treasury stock, and how a corporation acquires treasury stock.

Treasury stock is stock belonging to the corporation and subject to sale by it. According to the plaintiff, treasury stock, of which the corporation has a right to dispose, is stock that is unissued or may be issued for the purpose of sale, to increase the capital of the company; that it cannot include stock increase paid for out of the surplus assets. The plaintiff cites in support of his position the case of Knapp v. Publishers, 127 Mo. 53, where the doctrine contended for by the plaintiff is approved by this court. In that case, however, the principle is quoted from the report of the referee. The increased stock was distinctly credited to the parties who claimed it at the time the increase was made. The court interpreted the record to show that at the time there was no attempted disposition of the stock in dispute so as to affect the claim. In that respect the case differs from the situation here.

The facts conceded by the appellant show that he has not been injured in the slightest degree by the proceedings complained of. He plants his case upon this proposition: a stockholder is entitled to preserve his pro rata interest in the corporation, and that pro rata interest cannot be changed by any act, or manipulation of the assets, by the majority stockholders or directors. That right of the plaintiff has been preserved; he has not lost in any degree his pro rata interest in the corporation. At the time of the increase he had 652 shares of stock; that was his proportion of 40,000 shares. When the company increased the stock to 100,000 shares, retaining the whole of the increase as treasury stock, his pro rata interest in the corporation and its assets was neither increased nor diminished. That stock was corporate property just as the assets it represented was corporate property. When

the board of directors declared a dividend of fifty per
cent of the outstanding stock   plaintiff took his pro rata
part, 326 shares, of that distribution; he still retained the
same pro rata interest in the corporation. Then, when the
board of directors offered for sale the 5906 shares, the
plaintiff, like other stockholders, was permitted to pur-
chase and pay for his proportion of those shares. He did
buy and pay for them and thus still retained in the corpo-
ration the same proportionate interest that he had be-
fore, but the assets of the corporation were increased by
the amount paid on that stock so sold, so that each share
of his stock proportionately was worth   just as much
as it was before.   The plaintiff asserts that three
thousand shares of that stock were sold at par to
others than stockholders. Evidently that was because
the stockholders didn't want it, which was no con-
cern of his, because he got his proportion, and per-
sons buying that increase paid money which became
assets of the corporation, and his relative interest
was neither increased nor diminished by reason of that
sale.   The sale of the 5906 shares left him where he was
before, so far as the value of each share was concerned.
After that sale there remained 34,217 shares unissued as
treasury stock; whether that should remain in that shape
or be distributed in dividends made no difference in the
value of plaintiff's holdings.   The stock which he held
was worth just as much as all of his stock would have been
if that stock had been declared a dividend and he had got
his proportion.

The only way he could have been injured would have
been by the sale of the treasury stock for less than its
actual value without allowing him to get his proportionate
share of it.   For instance, if the property was worth ten
million dollars before the increase and the par value of
the stock was only four million dollars, then each share
of his stock was worth $250.   If all the 60,000 shares had
been sold at $250 each, that would have added fifteen
million dollars to the capital of the company.   The assets

would have been $25,000,000, represented by one hundred thousand shares of stock, so that each share would have been worth just as much as each share was before.    The only way in which a sale could injure plaintiff was to sell shares for less than their actual value and deprive him at the same time of his right to buy that portion which prorated with the amount of stock he held.

At the time of the increase he had 652 shares, and later acquired 326 in dividend, making 978 shares.    Now he claims in addition 978 and 489, a total of 1467 shares which he demands that the company issue to him.    If that be added to his 978 he would have 2445 shares out of the hundred thousand shares.    His stock in the 40,000 shares before the increase was 652.    He demands stock which would give him 2445, nearly four times as much as he had before, whereas the total increase made only two and a half times as much as the total capitalization before. What he demands would not merely maintain for him his pro rata interest in the corporation, but would increase it by more than his previous holding, in par value more than $75,000, in addition to his previous pro rata share, and in actual value much more than that.

On his own theory, to maintain his pro rata interest he was entitled to one and a half times additional stock. He got fifty per cent, 326 shares, as a stock dividend. At most then he would be entitled to one hundred per cent more, 652 shares.    He now wants not only one hundred and fifty per cent of his previous holding without giving credit for that 326 shares, but he demands one hundred and fifty per cent of the 326 shares, not only a double but a thrice repeated draft on the increase.

If we understand him he justifies this demand by his theory of donation.    He claims that the stockholders, representing more than two-thirds of the stock, who voted a resolution placing the increase in the treasury, thereby donated to the company their proportions of the increase, about 40,500 shares, and that would not affect the stockholders owning less than one-third who

were not present and did not participate in the pro-
ceeding. The effect of the argument is that plaintiff,
who was not present, not only had his pro rata portion
of the increase of 60,000 shares, but in addition had a
right to a second call upon that increase by taking also
a pro rata share from that part as donated, and a third
call upon the increase by taking a part which prorates
with his share of the part donated. He understands,
of course, that the donors gave the stock to the company
for working capital and had no intention of donating it
to him. This illustrates the peculiar sense of equity
with which the plaintiff comes into court.

We present this long explanation in order that the
points considered following may be clearer. It is un-
necessary, for the decision of this case, to go into the
authorities so as to settle that question—whether the
increase of stock from surplus assets of the company
belongs *ipso facto* to the stockholders without a declara-
tion of a stock dividend. My individual judgment is
plaintiff's contention is wrong.

II. On plaintiff's theory, so far as the 978 shares
demanded are concerned, his cause of action accrued the
moment the directors, May 10, 1906, resolved to retain
the increased stock in the treasury, and his alleged
cause of action, so far as the 489 shares are concerned,
accrued when he got his dividend of 326 shares in June

Limitations.
of the same year, 1906. He claims that his
cause of action did not accrue at that time
because it is not necessary to have certificate stock issued
to attest the ownership of the stock. Permitting the cer-
tificates to remain unissued would not affect his right to it,
nor put upon him the necessity of demanding or suing for
his certificates. Conceding that principle to be correct,
as a general rule, it would not apply in this case, because
the stockholders of the company and the directors of
the company, by the action taken May 10, 1906, asserted
a right to the stock hostile to his claim by making it

treasury stock as shown in the minutes set out above. It was that hostile act which he claims wronged him and furnished him a cause of action. No demand was necessary; so far as his rights were concerned he could sue then, and the statute began to run from that moment. That is true unless, as he claims, he was deceived by the acts and conduct of the board of directors and the officers of the company so that he was unaware of his rights.

The defendant relies upon that provision of Section 1317 to the effect that, in any action for relief upon the ground of fraud, a cause of action will not be deemed to accrue until the discovery of the fraud. That cannot Fraud. apply here, because the cause of action here is not one where relief is asked upon the ground of fraud. This is a straight suit for equitable relief to which the plaintiff claims he is entitled, arising out of the legitimate transactions of the company. That clause of the statute applies only to a case where the action is *based* on fraud. [25 Cyc. p. 1182.] If the plaintiff had sued immediately after that action of May, 1906, there would have been no mention of fraud. His cause of action would have been exactly the same as it is now. The alleged fraud consists in concealment of what was done. To prevent the running of the statute the plaintiff must rely upon a different principle.

Section 1334, Revised Statutes 1919, suspends the running of the statute where by some improper conduct the defendant has prevented the commencement of the action. It might be claimed by the plaintiff that the conduct of the defendants, concealing the true state of Concealment. affairs from him, prevented his commencing the action. Or he might rely upon the equitable doctrine that the statute would not run while fraudulent concealment by defendant of the fact that the plaintiff has a cause of action prevents plaintiff from ascertaining his rights. Whether the statute, Section 1334, or the equitable principle applies, it puts the mat-

ter in a different position from what it would be if the statute did not begin to run until the discovery of the fraud. If the action is founded upon fraud, as provided in the last clause of Section 1317, the plaintiff must *discover* the fraud (within ten years) before the statute begins to run, and it does not matter whether the party who has defrauded him does anything to prevent his discovery or not. On the other hand, if the cause of action is not founded upon fraud as the basis of the case, the ignorance of his rights would not prevent the statute from running. The statute would not be tolled in such case unless some act of the party against whom he has his cause of action has prevented his discovering the facts.

The mere ignorance of the party complaining, or of the silence of the party complained of, would not amount to actionable concealment. [Johnson v. United Rys. Co., 243 Mo. l. c. 298, and cases cited; Shelby County v. Bragg, 135 Mo. l. c. 298.] The court in the Bragg case construed the section of the statute relating to the improper conduct which prevents the commencement of the action, and says (l. c. 298):

"The question is not whether the county, or its agent, the county court, was merely ignorant of the facts constituting the cause of action. Such ignorance will not suspend the operation of the statute unless it can be properly attributed to the fraudulent concealment of the facts by the defendant.

"It cannot be said that the evidence of facts constituting plaintiff's cause of action was concealed or suppressed. The evidence all existed upon the official books and records of the office open to the examination of the courts."

See also State ex rel. v. Yates, 231 Mo. 289. The Bragg case is a leading case cited and quoted in a number of later cases.

In this case, in order to prevent the statute from running, it is necessary for the plaintiff to show that his

rights were not only unknown to him but were purposely concealed from him by the officers of the company. He seems to proceed upon that theory. He mentions a number of things which he claims tended to mislead him and prevent his knowing the facts. Among them he says the notice of the stockholders' meeting of April 24th failed to state that the proposed increase was fully paid out of the assets of the company. He also claims that neither he nor his predecessor in title got that notice, so it is immaterial what the notice contained so far as he is concerned.

Other concealments are mentioned. No entry was made on the company's books of treasury stock until September, 1908.

No certificates were ever issued for the stock claimed as treasury stock.

The records of the company fail to carry the donated treasury stock as an asset separate and distinct from the physical property of the company.

These and other omissions from the books, as well as misleading entries on the books, could have deceived the plaintiff only if he *examined* them; if he examined the books they informed him exactly of the facts which he claims were concealed. The minutes set out above were before him.

He says the certificates evidencing the fifty-per-cent dividend made no mention of the retention of the balance as treasury stock. Such a thing is no part of a certificate of stock.

He complains of a letter of the president of the company which notified him of his right to purchase his proportion of the 5906 shares of stock, being ten per cent of the outstanding stock, but did not apprise him of the 60,000 shares increase, because it showed only something over 59,000 shares outstanding altogether. It may be said of this letter, however, that it did show that instead of there being 40,000 shares of stock outstanding there were more than 59,000 shares issued. This should have notified

the plaintiff that there had been an increase of stock, and naturally he should have inquired the amount of the increase and what was done with the rest of it.

Again, prior to 1912, no reports relating to the financial condition of the company were sent out to the stockholders. That would not affect the question of the Statute of Limitations, because this suit was brought in November, 1920. The statement sent out in 1912 will be noticed below.

These and similar acts, as claimed by the plaintiff, proved a concealment from him of his cause of action and conduct which prevented him from bringing suit earlier.

It becomes important to consider what notice the appellant had of the situation, actual, implied and constructive.

There was certain constructive notice. The statement of increase of capital stock was duly certified by the Secretary of State, was filed for record in the office of the Recorder of Deeds of St. Francois County May 8, 1906, and filed with the Secretary of State May 9, 1906. The files in the office of the Secretary of State and in the Recorder's office showed that the capital stock had been increased from four million to ten million dollars, divided into 100,000 shares of the par value of one hundred dollars each, *full paid.* This was constructive notice to the appellant that the increase was paid out of the company's surplus assets. In case of fraudulent concealment, such as claimed here, the doctrine of constructive notice applies in this State. [Hudson v. Cahoon, 193 Mo. l. c. 560; Board of Commissioners v. Renshaw, 99 Pac. (Okla.) 638, l. c. 640, note; Thompson v. Lyons, 281 Mo. l. c. 449.] This constructive notice is conclusive upon the plaintiff as to just what was done with the increase of the capital stock and the particular rights which he claims here, unless circumstances to be next noticed would prevent the effect of that constructive notice.

III.   It is argued that the officers and directors were trustees for the stockholders, a fiduciary relation which made the constructive notice ineffective; that plaintiff had a right to rely upon what was told him by such officers and directors, and it was not incumbent upon him to search the record for what was done. If, in fact, he did rely upon the officers and directors for information and they deceived him, the point would be well taken. An examination of all the alleged facts, which the plaintiff claims misled him, fails to show any intentional deception of the plaintiff as to the facts in the case. In the first place there was no motive for misrepresenting the facts; the officers of the corporation were not apprised that the plaintiff expected to sue; there was no attempt anywhere to get from him anything to which they thought he was entitled; he was treated like all other stockholders, including those whose acts he complained of; there were no differences or difficulties between the plaintiff and the company until long afterwards. It is impossible to discover in any of the information or alleged misinformation which the officers and directors sent to the plaintiff, anything which showed an intention to deceive him, or which misrepresented any specific fact. It is only by the construction which the plaintiff has seen fit to put upon the facts that any misrepresentation occurred.

*Deception.*

If, as claimed by his counsel, he trusted the board of directors, he had a right to rely upon them. As a matter of fact, however, he didn't trust them. He appeared at a stockholders' meeting in May, 1915, and filed a protest there against some proceeding. He filed his suit May 10, 1915, in the Federal Court to set aside an action of the stockholders at the meeting May 7, 1915. About that time he went to the office of the Secretary of State and after producing his certificate of stock examined the files there. He said he examined the reports made from time to time by the officers of the company. If he didn't examine the statement of increase of capital stock on file in that office

his neglect to do so, when he wanted full information, is impossible to understand in a man as suspicious as he was.

The statement of increase in the capital stock in the Secretary of State's office and in the office of the Recorder of Deeds of St. Francois County, showed the increase from four million dollars to ten million dollars, all paid up in lawful money of the United States. He cannot take refuge in his reliance upon the officers and directors of the company for his information as to that particular fact, for he didn't rely upon them. His entire statement and demeanor shows that he did not trust them. He testified that from the time he came to Missouri in May, 1915, he spent all his time in his lawsuits against this company. He had nothing else on his thoughts. He employed some of the most famous attorneys of the country in his various lawsuits, including the celebrated Samuel Untermeyer of New York, as well as some of the most eminent lawyers in Missouri, to investigate the affairs of the company and to assert his rights in court, in connection with the company. Not later than May, 1915, he ceased to rely upon anything told him by the officers, and from that moment he had constructive notice of what was on file in the office of the Secretary of State and in the Recorder's office.

In 1915 he had *actual* notice of the proceedings of the stockholders and directors when the stock was increased, because the books were examined by his accountant and probably were examined by his attorneys. Those are the very proceedings of which he complains.

IV. Other facts put him upon his inquiry. He complains of the statements filed with the Secretary of State. He was dissatisfied with what he found there and by it was put upon his inquiry. Not only that, he *did* inquire further. He had his expert accountant, Mr. Wagner, examine the books of the company. Wagner testified that he examined the books of the company in 1915, and at the time he must have

Actual
Knowledge.

examined and read the minutes of the proceedings of the directors and stockholders of 1906 when the stock was increased, showing exactly the facts of which plaintiff complains. The book showed the treasury stock and showed all about the condition of the stock. He knew then as much as anybody connected with the company. That information was the information of the plaintiff; what he knew of course the plaintiff knew. The exact date at which Wagner examined the books of the company in 1915 is not stated by him, but since the plaintiff went to the Secretary of State's office in May, and soon after put Wagner to examining books, it could not have been very late in the year. This suit was filed November 9, 1920.

The plaintiff's predecessor in title was his wife. (Her stock is mentioned above as his stock). From his evidence it appears that he knew all about her business, and knew that she did not receive notice of the stockholders' meeting in April, 1906.

She acquired 652 shares of stock at different dates before her marriage. The certificates for those shares bore different dates, and showed the several increases of capital stock of the company. Two of them at least were for stock dividends. Two of those certificates, one for 124 shares issued May 8, 1905, and one for 279 shares issued January 9, 1906, showed the capital stock of the company to be $4,000,000 in 40,000 shares. She received her stock dividend June 1, 1906, for 326 shares and it showed the capital stock of the company to be $10,000,000 with 100,000 shares.

After her death in 1907, the plaintiff, who acquired her stock under her will, had her several certificates canceled and caused one certificate in lieu of them to be issued to him for 978 shares. That certificate showed a capital of $10,000,000 with 100,000 shares. Here then was actual notice to him that between January 9th and June 1, 1906, the capital stock was increased by 60,000 shares, representing $6,000,000.

He claims he did not know the increase was paid out of the surplus assets of the company. The certificate issued to his wife June 1, 1906, for 326 shares of dividend stock, showed him that stock must have been paid for out of the surplus assets of the company, else there would have been no stock dividends. How could he fail to follow that suggestion and know that the increase was paid out of the surplus assets? He says in his testimony that he thought at the time he testified that the stock dividend so declared was from the donation from the majority stockholders. He does not say when he arrived at that idea, but whenever he acquired that information he must have known that the majority had voted the 60,000 increase out of the surplus assets of the company. The theory of the donation is based on that fact, and if, when his wife got the stock dividend he thought *that* was its source, he must have known of the exact action taken April 24, 1906. He got the same information when he bought 122 shares of stock in July, 1909. He knew then that stock was being sold at par and that he was getting his pro rata share. His testimony shows he knew also that he could get more than his pro rata share because some of the stockholders did not take what was coming to them. That was ample notice to him, not only as to the amount of capital stock for which the company was incorporated by its increase but also the amount which was outstanding, because he knew what his pro rata part of the 40,000 shares, or $4,000,000 was, and he knew that he didn't have that proportion out of the 60,000 shares. A man of his aggressiveness, as indicated by his litigation, and his business acumen, with that fact staring him in the face would not have rested without inquiry as to some of his rights. He must have known by this information that over 34,000 shares of stock were not issued, or else if issued he didn't have his proportion.

He said he was misled by certain statements issued by the company of which the following, October 31, 1912, is a sample:

"ASSETS.

| | |
|---|---|
| "Property and Plant ............. | $14,295,490.50 |
| Investments ................... | 27,000.00 |
| Treasury Stock ................ | 3,400.00 |
| Advances .................... | 27,512.18 |
| Working and Trading Assets .... | 124,214.04 |
| Store and Rent Accounts ........ | 7,709.06 |
| Current Assets .................. | 543,989.99 |
| Deferred Charges to Income ..... | 141,443.83 |
| "Total ..................... | $15,170,759.60 |

"LIABILITIES.

| | |
|---|---|
| "Capital Stock ................. | $ 6,578,300.00 |
| First Mortgage Sinking Fund, 6% Gold Bond ................. | 1,997,000.00 |
| Notes Payable ............... | 1,804,900.00 |
| Current Liabilities ........... | 99,138.55 |
| Reserves ................... | 147,351.78 |
| Profit and Loss Surplus ........ | 4,544,069.27 |
| "Total ................... | $15,170,759.60" |

This statement shows that the net assets of the company above par value of the stock was $4,544,069.27. He knew from his certificate of stock that the capitalization was ten million dollars. He knew that something over $6,500,000 stock was issued and outstanding. What, then, did he suppose the balance of the authorized stock, over four million dollars, represented if not the surplus assets of the company?. There was the evidence right on the face of the report to show that the authorized capital was fully represented in the assets of the company. He got 326 shares as a stock dividend, and had every reason to know it came from the same source as the unissued stock.

He claims he was misled by the mention in that report of 34 shares (only) of treasury stock. That very item, if he supposed it was unissued stock, should have led him to inquire what was the status of 34,217 shares which the surplus assets showed were paid in full.

Many other circumstances were brought to the plaintiff's knowledge which must have put him upon his inquiry and charged him with notice of his alleged rights more than five years before the filing of this suit. But it is unnecessary to consider others than those mentioned. These circumstances are sufficient to show that he had knowledge of facts which made it incumbent upon him to inquire further and learn the exact facts. *He always had access to the books.* The fact that in May, 1915, he was suspicious and trusted no information from the directors, made it incumbent upon him to read the minutes of the company; his expert and probably his attorneys did read them. Whether they did or not he is charged with notice of what they contained. His action is barred by the five-year Statute of Limitations.

The judgment is affirmed. All concur.