Price *v.* Minot.

---

RICHARD PRICE *vs.* CHARLES H. MINOT & others.

**A.** (who was one of the three directors, and also treasurer, of a trading corporation, and owned 1801 of the 3600 shares of its capital stock) made a contract, in 1865, with B., (who was, and had been for several years, a servant of the corporation charged with important duties in its business, and paid by an annual salary,) of which they signed this memorandum: "Jan. 1, 1864, to Jan. 1, 1871. Earnings from Oct. 1, 1870, to Oct. 1, 1871, and all subsequent years, on 300 shares, to be paid to B., and said 300 shares to belong to B. but not to be transferred so long as A. desires to keep the control of the corporation, said 300 shares standing in his name and thereby giving him a majority of said shares. It is agreed that if between Jan. 1, 1864, and Jan. 1, 1871, B. should die or leave the corporation, *pro rata* shares for the then unexpired term shall be considered as

**earned** and due under above agreement, after Jan. 1, 1871. Whenever A. can keep **the** control or majority of shares and yet part with 300 shares, said 300 shares shall then **be** transferred to B." It was the policy of the managers of the corporation to accumulate its earnings without declaring dividends; and to interest its servants in their duties by making them sharers in the profits. B. remained in the service of the corporation until 1869, when he was dismissed from it without his fault, and although he was willing and offered to continue in it. A. took part in the dismissal, and at the same time gave B. notice to consider their contract terminated. *Held,* on a bill in equity thereupon filed by B. for the declaration against A. of a trust in B.'s favor in 300 shares of A.'s stock, (1) that the contract imported that if B. should continue in the service of the corporation until January 1, 1871, rendering services of the same general character as he had previously rendered, he should be considered as having earned the 300 shares; (2) that the contract imported a valid consideration for A.'s promise concerning these shares, in the implied agreement of B. to render future personal services to the corporation; (3) that the contract was not within the Gen. Sts. *c.* 105, § 6, which avoids agreements to sell or transfer shares in the stock of a corporation, unless the contracting party is at the time owner or assignee of the shares, or a duly authorized agent of the owner or assignee; (4) that the contract was also not avoided by a by-law of the corporation, that no shareholder should convey any shares, unless to his legal heirs, without first offering them to the corporation at par; (5) that the stipulation of the contract for an apportionment of the 300 shares in event of B.'s leaving the corporation was not applicable to a dismissal of B. from the service of the corporation without his fault; and (6) that the participation of A. in B.'s dismissal, and the notice which he gave to B. of a simultaneous termination of the contract, was a breach of the contract, which entitled B. to a decree declaring the trust in his favor, although the bill was filed before the time when his right to earnings on the shares was to accrue. *Held, also,* in reference to a prayer of the bill for a decree to restrain A., as owner of a majority of the shares, from permitting the corporation to carry on business unauthorized by the charter, (1) that the bill was not multifarious in seeking such relief; but (2) that it should not be granted in the absence of the corporation as a party.

BILL IN EQUITY filed December 23, 1869, against Charles H. Minot and the Tudor Company.

The bill alleged that the said company were a corporation organized under the Gen. Sts. *c.* 61, with the name of the Tudor Ice Company, which was afterwards changed to the Tudor Company, and with a capital stock fixed at $360,000, and divided into 3600 shares of the par value of $100; that on May 20, 1863, Minot, owning a majority of the shares, promised the plaintiff, in writing, for the purpose of inducing him to remain in the service of the corporation, to pay him a salary in money, and to hold 300 shares in trust for him, and transfer them to him whenever the profits earned thereon, from and after October 1, 1863, should be sufficient to pay for them at the price of $500 per share; that the plaintiff, for this consideration, remained in the service of the

corporation till September 30, 1869; that, shortly before February 17, 1865, the corporation having made large gains but declared no dividend since May 20, 1863, Minot and the plaintiff agreed further, in writing, that Minot should receive the profits on said 300 shares up to October 1, 1870, in full payment for the shares, and then transfer them to the plaintiff, or the plaintiff might abide by the terms of the previous writing, as within a reasonable time the plaintiff should elect; that, shortly afterwards, Minot requested the plaintiff to hand him said previous writing, and the plaintiff did so; and that, upon receiving it, Minot burned it and said to the plaintiff that he would give him another writing containing the same terms in a different form.

The bill then alleged that on or about February 17, 1865, Minot handed another writing, signed by himself, to the plaintiff, and requested the plaintiff to sign it, and the plaintiff, "being a clerk in the employment of said corporation, controlled by said Minot, and without perceiving or understanding the differences between said writing and the contract between himself and Minot destroyed by Minot as aforesaid, and seeing that by said writing the plaintiff was deemed to have elected Minot to take the profits on said 300 shares up to October 1, 1870, which was the plaintiff's wish, and without any legal or equitable consideration for the alteration of said previous contract," signed the writing; and that thus signed it read as follows:

"Jan. 1, 1864, to Jan. 1, 1871. Earnings from Oct. 1, 1870, to Oct. 1, 1871, and all subsequent years, on 300 shares, to be paid to R. Price — and said 300 shares to belong to R. Price, but not to be transferred so long as C. H. Minot desires to keep the control of Tudor Company, said 300 shares standing in his name and thereby giving him a majority of said shares. It is agreed that if, between Jan. 1, 1864, and Jan. 1, 1871, said R. Price should die or leave Tudor Co. — *pro rata* shares for the then expired term shall be considered as earned and due under above agm't, 'after Jan. 1, 1871.' Whenever C. H. Minot can keep the control or *majority* of shares, and yet part with 300 shares, said 300 shares shall then be transferred to R. Price. During 1864, $5000 paid Reed and Bartlett Estate; $10,000 Todd's Wharf,

$　　　New Tobacco Building; and any subsequent sums to be covered in some proper manner either by an issue of extra stock prior to Oct. 1, 1870, or in such other way as may be just.

"Boston, February 17, 1865. The foregoing read, approved, and agreed to, by　　　　　　　　　　"C. H. Minot.

"In presence of　　　　　　　　　　"Richard Price.

"Benjamin F. Field."

The bill alleged that this writing, so signed, was not equitably or legally binding on the plaintiff; but if it was binding, then that Minot, owning and controlling a majority of all the shares, caused the corporation to give the plaintiff written notice, on June 30, 1869, that he would be discharged from their employment on September 30, 1869, with intent to cause the plaintiff, under the terms of the writing, to lose his right to a portion of the 300 shares therein agreed to be transferred to him; that the plaintiff, on September 29, 1869, gave the corporation and Minot notice of his wish not to be discharged from the employment, and his readiness to continue therein, to which they replied that their notice of discharge was final and conclusive, and Minot stated that the plaintiff must consider his written agreement as terminating on said September 30; that, by reason of the premises, and this involuntary discharge of the plaintiff from the service of the corporation, no apportionment of the 300 shares specified in the writing can be justly made, and the plaintiff is entitled to the whole of them; and that, since the writing was signed, Minot had become owner of such a number of shares that the provision of the writing as to his retaining the 300 shares so due and belonging to the plaintiff was no longer in force, but nevertheless Minot refused to transfer them to the plaintiff.

The bill further alleged that the Tudor Ice Company were organized for the purpose, specified in the certificate of their organization filed with the secretary of the Commonwealth, of cutting, storing and selling ice, but in violation of law had engaged in other and different business, and had been and were now engaged in buying, importing and selling merchandise generally, pledging and employing in said business their funds and credit to amounts always large and sometimes exceeding $1,500,000; that the cor-

poration had bought real estate at Charlestown, and established and run thereon a tobacco factory, a jute mill and a rice mill, at a cost of at least $150,000, and had also established thereon a linseed-oil mill, at a cost of at least $250,000, and was preparing to run it; that these doings of the corporation originated with Minot, and were controlled by him by reason of his being owner of a majority of the shares of the capital stock, and had already impaired, and were likely to further impair, the value of the shares, and that for the protection of his 300 shares the plaintiff had notified and requested Minot not to permit the corporation to carry on business outside of the scope of its corporate powers, but Minot had taken no steps to terminate the business nor had notified or required the corporation to abstain therefrom.

The prayer was, for a discovery; for a decree declaring a trust in Minot in the 300 shares for the benefit of the plaintiff according to the terms of the writing burned by Minot, but if said writing should be deemed to have been cancelled, then declaring a trust in Minot in the 300 shares for the benefit of the plaintiff under the writing of February 17, 1865, and commanding their transfer to the plaintiff; for a decree to restrain Minot from permitting the corporation to carry on business not included in its certificate of organization; and for general relief.

Minot appeared and answered. Service was also made on the Tudor Company, but they did not appear.

The answer of Minot first alleged that the bill set forth and relied on distinct subjects matter of suit, which ought not to be joined; and that the proper parties were not before the court.

It admitted, in substance, the allegations of the bill concerning the organization of the Tudor Ice Company, and the number and par of the shares of the capital stock; and it alleged that on or about May 20, 1863, Minot was owner of 1801 shares, subject to the by-laws of the corporation, and continues to own them, and does not, and never has, owned more.

It then alleged that the plaintiff entered into the employment of the corporation on or about March 1, 1862, under an oral contract to serve for five years as a clerk, at an annual salary of $800 for the first year and increasing thereafter to $2500 for the fifth

year, and remained in its employment during the five years without any other contract, and at the end thereof continued to be employed by the corporation as a clerk, without any understanding and agreement between him and the corporation as to the period for which he should serve, until October 1, 1869, when his service ended because the corporation had no further occasion for it and had given him notice accordingly three months before.

It denied that Minot ever made any such agreement with the plaintiff as the written agreement alleged in the bill to have been burned ; or that the plaintiff continued in the service of the corporation until September 30, 1869, in consideration or consequence of any promise made to him by Minot ; or that Minot ever gave the plaintiff any election between two agreements, as alleged in the bill ; or that he ever burned any such writing as was alleged ; or that he ever agreed to give the plaintiff another writing in a different form ; or that he holds, or ever has held or agreed to hold, any shares of the stock in trust for the plaintiff.

It admitted that on or about February 17, 1865, Minot and the plaintiff signed the writing of that date, set forth in the bill ; denied that Minot ever at any time made any other agreement, written or oral, with the plaintiff, concerning stock in the corporation ; alleged that the writing was without consideration, and was a mere gratuity of Minot to the plaintiff, as a matter of friendship and a stimulus to the plaintiff in his service of a corporation in which Minot had a large personal interest ; and denied that the 300 shares mentioned in the writing belonged to the plaintiff, or that Minot holds them in trust for the plaintiff, or that the plaintiff is entitled to a transfer of them, or the earnings or profits of them.

It further denied that Minot ever controlled the business of the corporation, and alleged that the business was controlled by a board of three directors of whom he was one ; admitted that he was treasurer, but denied that he was active manager of the corporation ; admitted that the corporation, on June 30, 1869, through the board of directors, gave the plaintiff notice to terminate his employment on September 30, 1869 ; alleged that Minot " did not cause the corporation to give this notice, with the intent

thereby to impair any rights of the plaintiff under the writing "
of February 17, 1865 ; and denied that Minot " gave any notice
to the plaintiff as to the nature and character of his supposed
rights under that writing."

Finally it denied all the allegations of the bill concerning a
violation of law by the corporation in the conduct of its busi-
ness ; and alleged that the plaintiff was a director of the corpo-
ration for the four years succeeding the signing of the paper of
February 17, 1865, and in that capacity, and as clerk, at all
times knew of and participated in the doings of the corporation
of which he complained.

The plaintiff filed a general replication ; and the case was
heard by the chief justice, and reserved for the determination of
the full court, upon the pleadings and a commissioner's report of
the evidence.

A considerable part of the evidence related to the allegations
of the bill and answer concerning agreements between the plain-
tiff and Minot about an interest for the plaintiff in the stock,
before the writing of February 17, 1865 ; and another portion
related to the business alleged to have been done by the corpora-
tion *ultra vires.* Both of these are now immaterial for the pur-
poses of this report.

The evidence showed that the Tudor Ice Company was first
organized in 1860, and the original holders of the 3600 shares of
its stock were, Frederick Tudor, who held 2895 shares, and three
other persons, who held respectively 400 shares, 300 shares, and
5 shares, and all of whom had been previously associated with
Tudor in the ice business ; that Minot first became a stockholder
in the year 1861, by the transfer to him of 1801 shares by Tudor,
and a written agreement was made between him and Tudor, un-
der date of October 1, 1861, for the payment of the price of the
1801 shares from their future earnings, in which it was set forth
that it was " the intention of the parties hereto to secure to the
said Minot the uncontrolled majority in voting at all meetings of
the Tudor Ice Company ; " that the number of stockholders al-
ways remained small ; that most of them were actively concerned
in conducting the business of the corporation ; that the policy

pursued in the business from the beginning had been to accumulate earnings without declaring dividends ; and that the following was one of the by-laws of the corporation : " No proprietor shall devise, sell, assign or convey any shares to any person, except his legal heirs, without first offering them to the corporation at their par value, and the directors are hereby empowered to purchase all shares at said price, which may be offered to them, for account of the corporation, when they shall deem it expedient so to do."

The evidence also showed that at the time when Minot first became interested as a shareholder in the corporation he was a member of a mercantile firm in Boston, which the plaintiff was serving as a clerk at an annual salary of $1500 ; that the plaintiff entered the service of the corporation soon afterwards ; that the work which the plaintiff did in the employment of the corporation was not mere clerical work, but involved the exercise of a high degree of discretion, and the charge of large pecuniary interests ; and that the corporation, through its officers, and particularly through Minot, repeatedly expressed to him satisfaction with the manner in which he did it ; that the plaintiff's salary was paid in gold or its equivalent, and after the first five years of his service he was paid an annual salary exceeding $2500 ; that on the plaintiff's complaining to Minot, at some time early in the year 1866, of the insufficiency of his salary in view of the cost of living, reference was made by Minot, in writing, to the ultimate interest of the plaintiff in the stock, as an element for him to consider in computing what his compensation really was , and that, under date of May 15, 1868, the following writing, supplemental to the writing of February 17, 1865, was signed by him and Minot : " It is agreed between the undersigned, that, in the event of the passage of any act of the legislature, incorporating a company to whom the property of the Tudor Company, now in existence, shall be transferred, or any part thereof, the rights and interests of the undersigned Richard Price, by virtue of the agreement between us of February 17, 1865, shall be protected in such manner that he shall derive all the benefits and advantages that shall accrue to Mr. Minot, or any other of the shareholders, directly or indirectly, in proportion to his interests,

without prejudice to the rights of C. H. Minot to cover certain expenditures by the issue of extra stock, in the manner and to the extent provided in the above named instrument, dated February 17, 1865."

The evidence further showed that the plaintiff was notified to quit the service of the corporation, by a letter addressed to him under date of June 30, 1869, signed " Tudor Co. by C. H. Minot, Treasurer," in these terms: " Please to take notice that your services in our employ, and salary, will cease September 30, 1869 ; " that on September 29, 1869, he addressed to the corporation a written communication in these terms: " On the 30th of June last, I received a notification of that date, signed by Charles H. Minot, your treasurer, that my services in your employment, and my salary, would cease to-morrow. I desire to state that it is my wish to continue in your employment, and that you will consider this an offer on my part to do so. Will you state to me if the notice is to be considered by me final and conclusive ? " and to this he received under the same date the following reply, signed like the letter of June 30, and also countersigned by Minot and the other directors, as directors: " In reply to your note of this date, you will please consider our letter of June 30 to you as final and conclusive, and that your services in our employ will terminate September 30, 1869 ; " that on September 29, 1869, he also addressed the following letter to Minot: " I received, on the 30th of June last, a notice from you, as treasurer of the Tudor Com pany, that my services in the employment of that company, and my salary, would cease on the 30th of this month. I have notified the company of my desire to continue in their employment ; " and that under the same date Minot wrote to him as follows : " My written agreement with you you will please consider as terminating September 30, 1869, at the date your services end with the Tudor Company."

The evidence failed to sustain the allegations of the bill that Minot had become owner of a number of shares exceeding by more than 300 a majority of all the shares.

All other conclusions of fact, that are material, are stated in the opinion

*S. Bartlett & D. Thaxter*, for the plaintiff.

*C. B. Goodrich & H. W. Paine*, for Minot.

AMES, J. It is admitted that the plaintiff's right to maintain his bill must depend upon the contract of February 17, 1865. This contract has been so often recognized and acknowledged by both parties, that it must be considered as taking the place of all previous incomplete arrangements in relation to the same subject matter, if any such there were.

This agreement, although not expressed with entire technical precision, is far from being unintelligible. It imports that the plaintiff was at that time in the service of the Tudor Company and that he had been so employed since January 1, 1864. The evidence, indeed, shows that he entered their service at a still earlier date. The contract provides that he might continue in their employ until January 1, 1871. It does not undertake to define the nature of the service which he had rendered, or was to render ; and we must therefore infer that the parties fully understood each other upon that point, and that the plaintiff was to continue to be employed in substantially the same manner as he had been before. The report shows that the plaintiff held an important and confidential position in relation to the business of the company, and that his services were fully appreciated by and were satisfactory to the defendant.

The agreement provides that, at some future time, he was to become entitled to three hundred shares, without saying at what valuation or nominal price, and without even directly saying in what corporation, although it is sufficiently manifest, from other parts of the paper, that the Tudor Company was the one intended. We must conclude, upon the evidence, that the course of business in that company, in which the stockholders were few in number, and were all active participators in its management, was to increase the corporate fund by reserving and accumulating the earnings, instead of distributing them in the form of dividends. The earnings upon the three hundred shares, that should accrue after October 1, 1870, were to belong to the plaintiff, but the shares themselves were not to be transferred to him until a later period. The interpretation of the contract seems to be, that, if the plain·

.tiff should continue in the employment of the company until January 1, 1871, rendering services of the same general character as he had previously rendered, he should be considered as having earned three hundred shares in the stock then standing in the name of the defendant. The services were to pay for the shares, and were agreed to be their equivalent. There was, therefore, no occasion to name any other salary or price for the services, or to affix any definite valuation to the shares. In case of the death of the plaintiff, or if he should leave the employment of the company, before the expiration of the time limited by the contract, the number of shares to which he or his personal representative would be entitled was to be reduced in an equitable proportion. The transfer was to be delayed for the convenience of the defendant, who was to retain the nominal and legal title in his own hands until such time as he could part with them and yet retain the control of a majority of all the shares of the capital stock. The contract implies that there was to be an annual making up of the corporate accounts on the first day of October, for the purpose of ascertaining the earnings of the previous year ; and it indicates also (what the evidence shows was the usual policy of the company) a purpose on the part of its managers to have its servants and agents interested in its fortunes, and solicitous for its prosperity, by becoming participators in its profits.

Upon this view of the contract, (the correctness of which we cannot doubt,) it imports in its terms a valid and sufficient consideration. It is a promise by the defendant to pay in a specific mode for services to be rendered to a corporation in which he had a very large interest, and in which he had, and was desirous to keep, a controlling influence. The objection on the ground that the contract was without consideration cannot be sustained, without doing violence to the most familiar and well settled definitions of that word.

The objection that the contract is illegal under Gen. Sts. *c.* 105, § 6, appears to us to be equally untenable. According to that statute, every contract for the sale or transfer of any share in the stock of any corporation is void " unless the party contracting to sell or transfer the same is, at the time of making the contract,

the owner or assignee thereof," or authorized by such owner, &c., to sell and transfer. But the defendant, when he made this contract, owned a much larger number of shares than he promised to transfer. His undertaking was in relation to three hundred shares which he then held, and which he promised to hold until the happening of a future and expected event, and then to transfer. It will not bear the interpretation that he was first to buy three hundred additional shares, and to transfer those specifically, rather than any other three hundred that stood in his name.

The by-law of the corporation, which provides that no stock shall be transferred by any shareholder without having been first offered to the corporation itself at par, furnishes no legal objection to the defendant's contract. It might be an embarrassment in the way of its fulfilment, but cannot affect its interpretation. It may be, in view of his position and influence in the company, and his ability to outvote all the other stockholders, that this part of his contract presents no difficulty which he did not feel able to overcome. It is clearly no obstacle in the way of his holding the nominal and legal ownership, while at the same time the income, profits or benefits should belong wholly to the plaintiff.

We see no ground, therefore, on which it can be said that the contract was not legally and equitably binding upon the defendant.

It gave to the plaintiff the right to remain, at his option, in the service of the company for the whole of the stipulated period. It makes no reservation of any right on the part of the company to dismiss him from their service, or of any right on the part of the defendant to concur in such a dismissal. So far as the defendant is concerned, he has given to the plaintiff an absolute right to an opportunity to earn the three hundred shares by rendering the services which were the subject matter of the contract. This right can only be defeated by his death, or his voluntary withdrawal from the company's employment before the expiration of the term.

The expression, "if he should leave the Tudor Company" before January 1871, can only mean, if he should resign, or voluntarily quit or give up his employment. It is not the proper form

of expression for the case of his expulsion or dismissal by the act of the company, without his consent, and against his remonstrance. As the plaintiff has made a formal tender of his services, and has refused to resign his position, there has been no such termination of his engagement with the company as to render the defendant responsible, under the contract, for less than the whole· number of shares originally agreed upon. He cannot claim an apportionment on the ground that the contract was only partially fulfilled.

It is insisted that the removal of the plaintiff from his position was not the defendant's own act. It was, at least, an act in which he participated. He not only concurred in it officially and personally, but he made it the occasion for renouncing his own personal contract, and gave notice that his written agreement with the plaintiff would terminate at the same time. In so doing, he violated his contract. The plaintiff is in a position to say that he has wrongfully been prevented from finishing the proposed service, and that his rights are substantially the same as if he had served for the whole term.

The effect of the contract was to create a trust for the benefit of the plaintiff. It provided that he was to have an equitable right, title and interest in the shares, distinct from the mere legal ownership. After a certain date, all the earnings on these shares were to belong to him, and to be accounted for by the defendant to him. On the happening of a certain event, he was to be entitled to the legal ownership also. The defendant's promise is, that whenever (that is to say, as soon as) he can part with these shares and yet keep a majority of the stock, he will make a transfer accordingly. His holding of them in his own name in the mean time is provisional and temporary. The written contract is express, that this temporary holding is in trust for the plaintiff; and it will bear no other interpretation. There is nothing in the answer to show that the defendant has not been able to procure other shares, or that he has made any effort to do so.

It is true that the plaintiff's bill was filed before the time had arrived at which his right to the earnings upon the shares had accrued. But no such ground of defence is suggested in the de-

fendant's answer. According to the pleadings, he denies that he ever made the contract; he denies that the document of February 17, 1865, was of any validity, or amounted in law to a contract; he insists that it only provided for a gratuity, or mere act of friendship, and was without any legal or equitable consideration; and he denies that it created any trust, or gave the plaintiff any interest or right in the shares whatever. As we find, however, that none of these defences can be sustained, we find ourselves dealing with a case of the unwarrantable and wilful repudiation of a fully established trust, and a direct endeavor to deprive the party in whose favor it was created of all its benefits. Under these circumstances, we think that the plaintiff is entitled to have the trust declared, and that the objection that the suit is prematurely brought, even if it were open to the defendant upon the pleadings, cannot be maintained.

If the defendant had merely remained passive, the case in this respect might have stood differently. But, in fact, he has formally and in writing repudiated the contract; he has joined in removing the other party from his position; he has denied the plaintiff's right, and has taken active measures to defeat the trust. The plaintiff's right, although its practical enjoyment was deferred, was vested, and not merely contingent. It was not a mere probability of title, depending upon an event which might or might not happen, but it comes within what Lord Westbury describes as an existing right, which, whether vested or contingent, and however future or remote, may form the foundation of a right to come here to have it secured. *Davis* v. *Angel*, 10 Weekly Rep. 723.

A mere denial of the plaintiff's right might not, of itself, furnish a sufficient ground for a decree declaring the existence of the trust; but a denial of the right, coupled with an attempt to defeat it by taking part in the removal of the plaintiff from his position, and thereby to deprive him, in part at least, of the benefit of the trust, stands upon different ground. In *Baylies* v. *Payson*, 5 Allen, 473, such a denial, accompanied with proof that the trustee was about to go to a foreign country, was held sufficient ground for a like decree.

Our judgment therefore is, that the plaintiff is entitled to a decree declaring the existence of the trust, and ordering that the defendant hold the three hundred shares only upon the trust that all the earnings and profits accruing thereupon after October 1, 1870, are to belong to the plaintiff, and are to be accounted for to him; and that the shares themselves are to be transferred to him as soon as, by purchase or otherwise, the defendant shall have become the owner of not less than two thousand one hundred and one of the shares into which the capital of the company is now divided.

The objection that the bill is multifarious cannot be sustained. If the plaintiff is right in charging the existence and violation of a trust, he may properly ask the aid of the court, if the proper parties are before it, to prevent the trust fund from being squandered, or exposed to improper or unreasonable risks. We cannot see that, in so doing, there would be any confusion of distinct grounds of suit in one bill of complaint. *Robinson* v. *Guild*, 12 Met. 323.

But as to so much of the bill as charges that the Tudor Company, in its mode of doing business, has exceeded its corporate powers, and acted in violation of law, it is to be remembered that that corporation is not now a party to the suit. It is true that the bill alleges that this violation of law originated with, and was controlled, and carried into effect, by the defendant Minot, by reason of his being the owner of a majority of the stock; and that its effect has been, and must continue to be, to impair the value of the property; and the relief prayed for is, that he be enjoined and restrained, as to all future operations of the company, from allowing such illegal proceedings. But it is manifest that we cannot grant relief in that form without affecting the interests of the corporation, and possibly to a very great extent. Upon this question of *ultra vires*, the corporation is an indispensable party, having so great and important an interest in the controversy that no final decree upon the subject could be made without affecting that interest. We must decline, therefore, to make any such decree in its absence. *Palmer* v. *Stevens*, 100 Mass. 461. Story Eq. Pl. § 72. *Trust declared.*