*90 FINDINGS OF FACT, CONCLUSIONS OF LAW
OPINION
ADKINS, J.
The Court makes the following findings of fact and conclusions of law:'
FINDINGS OF FACT
1. Prior to 1932 defendant Julius M. Euler was employed as driver by the Quality Laundry Company doing business in the District of Columbia. Messrs. Ernest S. Churbuck and Charles W. Litchfield, partners, were engaged in the laundry business in the District of Columbia under the name of Dutch Maid Laundry Company.
2. Prior to 1932 said partners operating the Dutch Maid Laundry employed said Euler as driver for their laundry. Euler acting for the Dutch Maid Laundry continued as a laundry driver in approximately the same territory he had covered for the Quality Laundry Company. Euler brought with him a number of customers of the Quality Laundry, many of whom continued as customers during his employment by said partners and by plaintiff.
3. About March, 1932, the partners contemplated selling their business to the Home Laundry & Dry Cleaning & Dyeing Company, a corporation, hereinafter called Home Laundry. They informed Euler of pending negotiations and stated it would facilitate those negotiations if they had a written contract with him. Thereupon said partners and Euler entered into a contract, copy of which is Exhibit A to the bill of complaint and is made part hereof by reference. No misrepresentations were made to said Euler by said partners to procure him to sign said contract.
Prior to signing said contract defendant was thoroughly familiar with the method of doing business by the partners, and there had been no substantial change in those methods *91 during his employment. The only important secret in the laundry business is the list of customers and the method of approaching each customer in calling for the laundry.
4. Under date of November 30, 1932, said partners and said Home Laundry entered into a contract, marked Plaintiff’s Ex. 3, which is made part hereof by reference. In said contract the partners did grant and transfer to said Home Laundry all their right, title and interest in and to the good will, trade and business of the partners.
Under date of December 7, 1932, said Home Laundry wrote the Dutch Maid Laundry, Inc., that the Home Laúndry had purchased said partnership business—
“Which said business will be assigned and transferred to you. In consideration thereof, and in accordance with previous plan, you will kindly issue stock on account thereof in the total of 50 shares, to be divided and issued to the following persons:
“Albert E. MacKenzie.................................. 16 shares
Theodore A. Warner.................................... 1 share
Joseph E. Coe.............................................. 1 share
Donald F. MacKenzie................................ 16 shares
Fred W. MacKenzie.................................... 16 shares”
Some time in November, 1932, said Home Laundry caused plaintiff corporation to be formed. After the letter of December 7, 1932, plaintiff corporation carried on the business theretofore conducted by the partners, and defendant acted as its driver and was paid by plaintiff. Plaintiff and defendant conducted their business as though the contract mentioned in Finding 3 had been transferred to plaintiff. Plaintiff in fact did become the successor of said partners so far as their laundry business was concerned.
Under date of December 5, 1933, and during the progress of this trial said Home Laundry executed and delivered to plaintiff corporation the document Plaintiff’s Ex. 5 made part hereof by reference.
*92 There was no assignment of plaintiff's contract (mentioned in Finding 3) other than is set forth in these findings.’
5. Thereafter the Dutch Maid Corporation took over the customers of the Dutch Maid partnership and its drivers continued to solicit their business. For all practical purposes the Dutch Maid corporation succeeded to the business of the Dutch Maid partnership.
The Dutch Maid corporation had no laundry machinery but the laundry work was performed by the Home Laundry for a percentage of the gross receipts of the Dutch Maid Corporation.
6. About January, 1933, Euler was requested to give bond for the payment by him to plaintiff of his collections. It was finally agreed between him and plaintiff that in lieu of bond he should deposit with plaintiff $2.50 each week as cash security, and this amount thereafter was retained each week by plaintiff.
7. Under his employment Euler was required by the Dutch Maid Corporation to account for all moneys collected by him from the customers of the laundry. He was permitted to give credit to the customers up to about 30% of the amount due each week on the laundry handled by him. For sometime prior to July, 1933, Euler had extended credit to customers in a much larger amount than 30%. Euler was personally responsible for this excess. He was unable to pay this sum to the Dutch Maid Corporation. About July 25,1933, the Dutch Maid Corporation loaned Euler $150 with which to pay the amount due from him to the laundry. That loan was made by a check from the laundry to Euler which he immediately endorsed back to the laundry. It was then agreed that Euler should pay this debt to the laundry by weekly payments of $5, and thereafter such payments were taken by the laundry in its weekly statements between them.
Euler thought this was a satisfactory adjustment of the matter and that his employment was to continue.
*93 The active manager of the Dutch Maid Company testified that he considered the conduct of Euler a breach of the contract justifying Euler’s discharge; that he intended to discharge Euler but he could not do it at the time because he had no driver ready to take Euler’s place and he believed Euler would quit instantly if he were notified of the intention to discharge him.
8. In the laundry business the driver is the one dealing with the customers. Frequently the customers have no other relation with the laundry and many of them will follow a laundry driver from one laundry to another.
9. On August 21, 1933, the active manager of the Dutch Maid Corporation ordered a supervisor to go around with Euler as he solicited and delivered laundry. The purpose was to enable the supervisor to learn all he could about the route so as to acquaint the new driver with such information. Euler suspected that his discharge was imminent and permitted the supervisor to accompany him only two days. On August 22 Euler was discharged by the Dutch Maid Corporation.
If, when the adjustment was made with Euler in July, 1933, it was the intention of the Dutch Maid Corporation to discharge Euler because of his extending credit in so large an amount, I am unable to see any satisfactory reason for continuing him for four weeks. It seemed to me that the supervisor could have been promptly spared from other work in order to learn Euler’s route, and that another driver could have been secured in less than four weeks.
10. After his discharge Euler was re-employed by the Quality Laundry. On the following Monday, August 28, he began work for the Quality Laundry and solicited and obtained the laundry of a number of customers he had been serving while in the employ of plaintiff. The same thing occurred on Tuesday. On Wednesday a temporary restraining order was signed by this court and the temporary injunction was later granted.
*94 11. Since his discharge by plaintiff, defendant has earned between $19 and $20 each week.
CONCLUSIONS OF LAW
1. During the existence of the contract it was never assigned to plaintiff but remained the property of the Home Laundry. Therefore plaintiff is not the proper party to bring this suit.
2. Plaintiff condoned defendant’s breach of his contract.
3. The agreement not to engage in business on the laundry route or to seek laundry from plaintiff’s customers is confined to a voluntary leaving and not to a discharge.
4. The bill should be dismissed and defendant should be awarded damages equal to $15 per week from the signing of the restraining order until the effective dissolution of the temporary injunction and to a reasonable amount as counsel fee.
OPINION
ADKINS, J.
1. The contract (Ex. A) contains the following paragraph :
“The privileges and benefits of this contract shall extend to the successors and assigns of the party of the first part.”
The partners conveyed their business to the Home Laundry, a corporation. Without formal transfer plaintiff succeeded to the business of the partners. At the time this trial began the Home Laundry had the title to that contract and was assignee of the partners but plaintiff corporation was the successor to their business. It seems to me the successor was not entitled to enforce the contract. When the formal transfer was made to plaintiff December 5, 1933, the contract had been terminated by the act of discharging defendant. Therefore I think the Dutch Maid Laundry, Inc., is not entitled to sue under said contract.
*95 2. The only breach by defendant of the contract was the extension of excessive credit. It was not contended at the trial that defendant had failed to account for all collections made by him. About July 25, 1933, defendant and plaintiff’s officers discussed this matter and arranged a settlement by which defendant assumed liability for the excessive credit and agreed to pay plaintiff $5 a week thereon. Nothing was said by plaintiff’s officers to indicate that this was not a satisfactory settlement. I think this was a condonation of defendant’s breach. Therefore the discharge of defendant was not for cause but was an exercise of the right of the employer to terminate the contract.
3. The contract provides that while defendant is in the employ of the party of the first part “or within one year after leaving said service” the defendant would not call for or deliver laundry to any person who during the term of his contract shall have been a customer of the party of the first part, nor attempt to solicit said customers on the route which he had served.
The contract also provides that either party may terminate it at any time upon one week’s notice. I have held that the contract was terminated under this provision.
Such a contract must be given a reasonable construction. To my mind the language used refers to a voluntary leaving by defendant and not to an involuntary discharge by the employer without cause.
This is the view taken of somewhat similar contracts in Muesling v. Int. Ry. Co., 147 N. Y. Supp. 177, and in Price v. Minot, 107 Mass. 49, in which case the court said:
“And this leads to the construction that the word ‘leaving’ means the voluntary act of the plaintiff, and not his dismissal by defendant.
“Some, at least, of the primary meanings of the word ‘leave’ is to quit or depart, implying volition on the part of the person leaving or departing. The added words ‘for any reason whatsoever’ do not, in our opinion, materially alter or *96 enlarge the primary meaning of the word used. Had it been the intention of the parties to have included cases of dismissal, it would have been very easy to have expressed that purpose by adding the words 'or being dismissed’ which was not done.”
Plaintiff’s counsel rely on Mutual Milk & Cream, Co. v. Heldt, 105 N. Y. Supp. 661. This decision is based in part upon the earlier case of Mutual Milk & Cream Co. v. Prigge, 98 N. Y. Supp. 458, where the milk driver left voluntarily and in which case the only defense was that the driver was a minor.
Red Star Yeast & Products Co. v. Hague, 157 N. E. 393, 25 Ohio Apps. 100, follows the Heldt case but there the contract was conditioned upon the employee leaving ''from whatsoever cause.”
4. I have fixed the defendant’s damages at somewhat less than the amount he was earning while in the plaintiff’s employ.
I agree with defendant’s counsel that the case is one in which defendant is entitled to an attorney fee. The obtaining of an injunction is the principal purpose of this bill. Therefore the case is governed by Local Union No. 368 v. Barker Painting Co., 58 App. D. C. 51, and not by Stanfield v. Vollbehr, 61 App. D. C. 239.
If counsel cannot agree on the amount of the fee, I will fix it.