STATE EX REL. OLLIE HARWOOD ET AL., Relators, v. EUGENE J. SAR-
TORIUS, Judge.—No. 39973.—198 S. W. (2d) 690.

Court en Banc, December 16, 1946.

Rehearing Denied, January 13, 1947.

*Fordyce, White, Mayne, Williams & Hartman, Vincent M. Flynn,*
and *Joseph Renard* for relators.

*Edward K. Schwartz* for respondent.

ELLISON, J.—This is a proceeding in prohibition instituted in this court by the relatrices, Misses Ollie Harwood and Vivian Patterson, against the respondent, Hon. Eugene J. Sartorious, Judge of the circuit court of the City of St. Louis. The cause is at issue on relatrices' petition for our writ, respondent's return and a transcript of the evidence in the underlying litigation, which has been brought up by agreement.

Relatrices seek to prohibit the enforcement against them of certain preventive and mandatory injunctive orders decreed by respondent allegedly in excess of his jurisdiction as chancellor, in an equity suit brought against the relatrices by one Madame Henrietta de Bernard (hereinafter called Madame Bernard). The petition in the equity suit prayed: cancellation of two stock certificates for 100 shares each of the capital stock of a Missouri corporation styled Maison de Bernard, Inc., severally issued some five years earlier to the relatrices, respectively; that relatrices be divested of any right, title or interest in said shares of stock and any others of the corporation; that they be enjoined from interfering with Madame Bernard's management

and control of the corporation; and for general relief. The corporation was not joined as a party defendant in the equity suit. Before stating the nature of the decretal orders made by respondent and assailed by relatrices, we must outline the facts.

The undisputed evidence adduced in the equity suit was as follows. The corporation was chartered by Madame Bernard in 1927 to take over a business she had earlier founded in St. Louis dealing in women's tailored and ready-to-wear apparel. It had 500 shares of capital stock of the par value of $100 per share. In the beginning she owned all of it. But in 1932 at the suggestion of her bankers she transferred 155 shares to the corporation's treasury to eliminate an item of good will appraised at $15,500 in the original schedule of capital assets. This left her with 345 shares of which 341 stood in her name, the other four being held by two employees as qualifying shares since the statutes required a manufacturing or business corporation to have at least three shareholders and directors. Sec's 4555 (7) and 4933, R. S. 1929. Relatrix Harwood was one of these two employees, holding two qualifying shares. She had entered the service of the corporation as bookkeeper that year—1932. But she lays no claim to those two shares and they may be treated as actually belonging to Madame Bernard. The other two qualifying shares were issued to a former employee named Flora Witbeck, who receipted for them on the stock book. Her stock certificate is not accounted for on the corporate records, but there was testimony in the equity suit that Madame Bernard had possession of it, and since the relatrices do not claim the two shares, we think it may be conceded for the purposes of the case that Madame Bernard owned them also, giving her the entire 345 shares outside of the 155 shares of treasury stock.

Madame Bernard's version of the disputed facts was that seven or eight years later, in the summer of 1940, the relatrices requested her to sell each of them 100 shares of her stock in the corporation for $500, or $1,000 for the two. She was dubious because it would leave her only 145 shares. Thereupon the relatrix Harwood [acting also for relatrix Patterson] proposed that the 155 shares of treasury stock and 45 shares of Madame Bernard's own stock be sold to them, making their 200 shares, and leaving her with 300 shares and stock control. She consented to that. But since relatrix Harwood felt she needed advice as to the proper manner of transferring the treasury stock, certificates for the two blocks of 100 shares were temporarily issued to the relatrices, respectively, on September 1, 1940, out of Madame Bernard's 345 shares, and a new certificate was issued to her for 143 shares, which together with the two qualifying shares in the name of Miss Witbeck took up the outstanding 345 shares. As a part of this arrangement relatrix Harwood promised to adjust the stock holdings later so that she (Madame Bernard) would be credited

with 300 shares. Relatrices were elected as two of the three directors; Madame Bernard was president; relatrix Patterson was made vice-president; and the relatrix Harwood, secretary and treasurer. She continued also as bookkeeper.

Madame Bernard further testified that for over four years the business of the corporation was conducted harmoniously with her in control, but that relatrix Harwood failed to make the stock readjustment. Sometime in 1944 the attitude of the relatrices changed. They began to mistreat her and she learned they had defrauded her by two bookkeeping entries. One of these involved the $1000 allegedly paid in by relatrices for their 200 shares of stock. For some time that money had been credited on the corporation's books to "Paid in surplus", and thereby treated as a corporate asset. But in 1944 the amount was transferred to "Due Officers and Stockholders", making it appear that the money was due back to the relatrices as a debt. The second entry covered an item of $2880.87, which Madame Bernard had advanced to the corporation before relatrices' entrance into the business. In November, 1941, relatrix Harwood transferred that item from "Due Officers and Stockholders" to "Paid in surplus" thereby making it appear as a corporate asset. These, in brief, were the asserted facts on which Madame Bernard based her equity suit, though she did not specifically pray for relief as to the bookkeeping entries. After an ineffectual demand on relatrices in May, 1945, she called a special meeting of the stockholders on August 1, 1945, at which the parties and their counsel were unable to agree. Shortly thereafter she brought the equity suit.

Relatrices' version of the disputed facts was as follows. Miss Harwood testified she and Miss Patterson did not *buy* the 200 shares of stock from Madame Bernard, but that the latter transferred 100 shares to each of them in consideration of their respectively advancing $500 to the corporation as a loan for the purpose of "securing", or underwriting, a two year lease at a new location, the lease calling for a down payment of $1000 which was to cover the rent for the last five months of its term and to constitute liquidated damages in case of a breach. Relatrix Harwood testified the impelling reasons for the transaction were that the corporation was insolvent; that Madame Bernard was improvident and harassed by creditors; that there was an economic depression; and that other like businesses had moved to the new location. She further declared the matter of stock control was never mentioned at the time of the transaction, or until 1945. Relatrices assert Madame Bernard's contention that they were to purchase the 155 shares of treasury stock from the corporation was an afterthought, inspired by the fact that the value of the stock had increased by 1945, because of the business prosperity attending World War II.

As to the bookkeeping entries. Relatrix Harwood testified (and it is a fact) that the $1000 advanced by her and relatrix Patterson on September 30, 1940 to secure ▮▮▮▮ the new lease, was carried on the books of the corporation until late in 1941, as a credit to them and a debit against the corporation; and that the $2880.87 theretofore advanced to the corporation by Madame Bernard also was carried on the books as a credit item in her favor. But Miss Harwood said that in November, 1941, Madame Bernard's friend and adviser, a certified accountant named Thompson, who had made annual audits of the books of the corporation since 1928, called her on the telephone after a conference with Madame Bernard and her then attorney, and directed her as bookkeeper to transfer both these items to "Paid in surplus" and said they could later be drawn out as "dividends". The purpose of these transfers was to conceal Madame Bernard's assets and make it appear she was insolvent.

Miss Harwood further testified Mr. Thompson told her to destroy or burn the ledger, journal and trial balance pages, or sheets containing the objectionable entries, and to substitute new sheets in the records with the entries changed as directed. She did abstract the old loose leaf sheets and insert new ones, but did not destroy the former and they were produced at the trial. One sheet in a bound journal was cut out and not produced, but she testified its contents were copied verbatim on the next page of the journal.

There was further evidence, some of which clearly tended to corroborate one or another of the adversary parties, and some of close or doubtful import, which must be weighed. Considering first the issue on the changed bookkeeping entries. Mr. Thompson, the accountant, denied telling relatrix Harwood to transfer the $1000 advanced by relatrices and the $2880.87 due Madame Bernard from "Due Officers and Stockholders" to "Paid in Surplus", though he admitted having a conversation with Miss Harwood on that subject and at about the time specified by her. He said she was the one who suggested "pulling out" the ledger page showing the corporation owed Madame Bernard $2880.87, or transferring the amount to surplus, because Madame Bernard had a lawsuit threatening her, and if her creditors knew the corporation owed her that money it would be embarrassed since it couldn't pay her then. Mr. Thompson said he advised against changing the records, and that he told Miss Harwood if she put the $2880.87 into surplus his audits would still "broadcast to the world" that the amount was due Madame Bernard.

It seems unlikely that the relatrices on their own initiative and without any outside suggestion, would have changed the original book entry which had stood for over a year in their favor, showing the $1000 they had advanced to the corporation was due back to them, and would have substituted an entry making that money a part of the corporation's surplus. There was no point in their doing it, since

they were not pressed by creditors as was Madame Bernard. And the evidence showed that the former entry crediting the $1000 to them was reinstated in both the corporation's books and Mr. Thompson's audit in 1944. He said he did this on advice of relatrix Harwood without consulting Madame Bernard. And further, while Mr. Thompson in his audits of 1942-3-4 continued to "broadcast" by including Madame Bernard's $2880.87 in the aggregate shown as "Due stockholders and directors", nevertheless he knew the corporation's books carried it in surplus, and yet failed to comment on the discrepancy either in his audits or transmitting letters, although the audits purported to be based on the books. Neither did he tell Madame Bernard about it, so far as he could remember.

Looking next to the corroborative evidence on the other and more important issue: whether relatrices agreed that Madame Bernard should retain control of the corporation; and whether their 200 shares were to come out of Madame Bernard's 345 shares, or under some plan that would leave her with stock control.

Mr. Thompson, the accountant, directly corroborated Madame Bernard on this issue. He testified on direct examination that in the summer of 1940 the relatrices conferred with him about starting a competing business. He told them it would taken $10,000 or $12,000 capital. They said they only had $1000 between them, and suggested they might get Madame Bernard ▆▆▆ to sell them some of her stock. On cross-examination he admitted he learned shortly afterward that relatrices each had acquired 100 shares of stock from Madame Bernard in September, 1940; and he already knew there were only 345 shares outstanding altogether. But when asked if he didn't know this made the relatrices the majority stockholders, he said for the first time that relatrix Harwood told him on the telephone they had arranged with Madame Bernard that she would be the controlling stockholder. However, he further admitted that throughout the five years (nearly) between 1940 and 1945 neither Madame Bernard nor anyone else ever said anything to him about transferring the 155 shares of treasury stock to her, nor did he discuss it with her or anyone else, although he knew from his annual audits that only 143 shares stood in her name.

There was other evidence circumstantially bearing on that issue, namely: whether the relatrices lulled Madame Bernard into security during the first four years and then changed their attitude; and whether the corporation was in such financial condition in 1940 as would make the purchase of 200 shares of its stock for $1,000 an attractive business venture. On the first point Madame Bernard was corroborated by two former employees and one patroness of the establishment, who testified that in 1944 and 1945 relatrices criticized her and became overbearing.

On the other hand, there was undisputed direct evidence that the relatrices began to assert some authority within two months after they became stockholders and directors on September 1, 1940. The minutes of a special directors' meeting held on October 29, 1940 show that Miss Harwood suggested each of the three officers receive a salary of $75 per month—a drastic reduction from the $250 per month Madame Bernard had been drawing theretofore. She contended her salary should be $130 per month but the directors were unable to agree, and Madame Bernard testified that later a monthly salary of $120 for each of the three stockholders was agreed upon. At that same meeting it was acknowledged that certain furniture, light fixtures, tapestries and rugs belonged to Madame Bernard personally and they were appraised at $2560.00. Also certain oil paintings belonging to the corporation and valued in the 1940 audit at $812.75 were ordered sold for the best price obtainable to obtain required current working capital.

On the financial condition of the corporation in 1940 when relatrices acquired their stock. At that time the establishment was located in Madame Bernard's seventeen room residence at 4378 Lindell Boulevard, which was heavily mortgaged. She was collecting $300 per month rent and $250 per month salary, and also using corporate funds for subsistence, charging them against her rent and salary account. It was that arrangement which produced the $2880.87 balance then due Madame Bernard. Relatrix Harwood's salary then was $75 per month and relatrix Patterson's $15 per week. The corporation was in a precarious financial situation. Mr. Thompson's audit for that year showed the corporation had an accumulated deficit of $43,087.77, which exceeded the outstanding capital stock (at par) and surplus, by $968.85. The net operating loss was $6481.77. Cash in the bank was $154.75; petty cash, $110; a total of only $264.75. Customers' accounts were $3,684.54, of which over 15% were more than a year old. Only one bank loan was shown outstanding, on which a balance of $498 was due, payable $166 per month. Not only was this poor showing made in the audit. Mr. Thompson's letter transmitting it made this comment:

"Inasmuch as there had been little change in current operating expenses as compared to prior years, and the net sales have gradually decreased from $52,933.99 for the fiscal year ended July 31, 1937 to $34,176.94 for the current fiscal year, it appears that in order for the Company to continue operating under its present circumstances, it must have a substantial increase in sales volume, together with a more favorable turnover of its merchandise inventory. Operating expenses should be curtailed and watched as much as possible in order to keep them in line with the gross profits accruing from sales. . . ."

In these circumstances, in August, 1940, while Madame Bernard was in California on a summer vacation, Miss Harwood wrote her three letters about the new location at 4494 Maryland Avenue (where the rent was $100 per month cheaper) and upon her return the stock transaction was consummated and the lease made. Miss Harwood testified that at that time the business was bankrupt, and was having difficulty paying its bills and meeting payrolls.

Notwithstanding the showing made in his audit of July 31, 1940 and his letter transmitting it, Mr. Thompson testified in the equity case that he did not consider the corporation bankrupt at that time. The reasons he gave were that it was still going; Madame Bernard would not sue it for the $2880.87 it owed her; and she was its biggest drawing card and could still get credit. As evidence of its credit standing, Madame Bernard's counsel referred at the trial to pages of the cash receipt record which he said showed the corporation had borrowed from the Mutual Bank $2000 on July 20, 1940; $2000 on October 15, 1940; and another note for $2475.83 over three years later.

We have been unable to verify all of these dates and figures. And the 1940 audit does not show a $2000 note outstanding. But Miss Harwood admitted the corporation did borrow $2000 from the Mutual Bank in October and a like amount in December, 1940. However, she said the notes were secured by an assignment of customers' accounts receivable, and that both she and Madame Bernard indorsed the paper individually. In addition to that it was shown that three times in 1940 and 1941 New York wholesalers exacted agreements from Madame Bernard subordinating her claims against the corporation to theirs. And as late as October, 1943, the Mutual Bank did the same thing—this notwithstanding the corporation was in a better financial position by that time. Its net sales had increased over $18,000, from $34,176.94 in 1940 to $52,308.06 in 1943. And the next year, 1944, they went up to $64,280.87—$30,000 above the figure when relatrices acquired their stock.

Madame Bernard's opinion with respect to her own financial situation, her control of the corporation and the value of its stock, as expressed in 1942 shortly after the above transactions occurred, differed from her testimony at the trial of the equity suit in December, 1945, as hereinbefore set out. A letter written by her to relatrix Harwood on January 11, 1942, was introduced in evidence. In the letter she said "I am in a daze thinking about our finances." It seems from the letter that Miss Harwood had made some suggestion to Madame about getting $828 from "Henry" under some arrangement that would "tie them up" for a year. In the letter Madame advised against it, saying, "This borrowing from one to pay to the other is very bad business it does not get us anywhere."

Then she continued (italics ours): "I think you and Pat (relatrix Patterson?) are just stubborn, when Jim is willing to help us get on our feet and all he asks is 25 shares from each of us *which are not worth $5 a share,* and as business is and perhaps will be in the next 3 years they will not be worth any more than they are now." She stated that "Jim" would advance $3000 on the 75 shares of stock, which would put the business on its feet and give it a rating; that he would not draw a cent from the corporation for 3 years; that he thought the stock was worth not more than $25 per share, making $1875 for the 75 shares; and that all they would have to do would be to pay him back the difference ($1125). Following that she added: "Remember *your shares dont cost you anything*" and further arguing, said: "*I gave up 2 hundred shares to you* where is your sence?" It will be noticed Madame Bernard made no reference in her letter to the 155 shares of treasury stock. Seemingly she did not consider it available for sale or the raising of much needed funds.

On another occasion in 1942 Madame Bernard stated her views with respect to her position as a stockholder in the corporation. Shortly after the corporation had moved in 1940 from her mortgaged residence at 4378 Lindell Boulevard, the Security National Bank, Savings and Trust Company foreclosed under the mortgage but the property failed to bring the amount of the secured debt. Thereupon the bank sued Madame Bernard for the deficiency and obtained a judgment late in 1941. The execution on the judgment being returned unsatisfied, the bank obtained an order under Sec. 1391, R. S. 1939 and Mo., R. S. A., requiring Madame Bernard as the judgment debtor to appear before the judge of the court for examination. In the course of that examination on March 6, 1942, she was interrogated about her stockholdings in Maison de Bernard, Inc.

She testified that she was president and a director and owned 143 shares of its capital stock; that "two young ladies owned the balance"; that the total outstanding stock was 340 (345) shares. Then she was asked: "Q. You have a minority interest, do you? Do you understand that? Those two young ladies betweeen them own more than you do? Is that right? A. That's right. Q. Did you pay for this stock? A. They have put in the business money enough to start this new place on Maryland Avenue. We didn't have anything to start any place." On cross-examination Madame Bernard's own (then) counsel asked her: "And this stock in this company that you are president of—I believe you mentioned 140 shares? A. 40 or 43, something like that—143. Q. I thought you told me it was 145? A. No; it is 143."

Madame Bernard further stated that her 143 shares of stock in the corporation had been pledged to it for $850 she owed it, the money having been advanced to her from time to time for subsistence; and that she had redeemed the stock and re-pledged it to her niece Rose

Shapiro for another debt of $875. She declared the stock was absolutely worthless because the corporation was "still $10,000 in the red." At the trial of the equity case she accounted for the conflict in her testimony then with her testimony in the debtor's examination by saying the lawyer for the execution creditor had her confused at that time. She admitted in her cross-examination in the equity suit that the aforesaid judgment against her held by the Security National Bank, Savings and Trust Company was assigned by the bank to Miss Shapiro for $1500 on July 20, 1945. The next day she (Madame Bernard) called the special meeting of the stockholders of the corporation for August 1, heretofore referred to; and on July 23 Miss Shapiro released the judgment.

Miss Harwood admitted on cross-examination that "a short time" after she changed the ledger sheets in November, 1941, she was offered an opportunity to sell "this stock" (apparently referring to the 200 shares held by her and Miss Patterson) for about $25 per share, and refused to sell.

On these facts, the respondent judge rendered a decree for Madame Bernard:

(1) holding that relatrices had no right, title or interest in the 200 shares of stock covered by their two stock certificates and requiring that they be surrendered for cancellation;

(2) requiring the relatrices within 15 days to join with Madame Bernard in the issuance of the 155 shares of treasury stock by certificates to themselves—77.5 shares to each relatrix;

(3) requiring them to join with Madame Bernard in the issuance of certificates for 45 shares of Madame Bernard's own stock—22.5 shares to each relatrix; and also in the issuance of a new certificate for 296 shares to Madame Bernard, which, with the four outstanding qualifying shares, would make 300 shares owned by her;

(4) divesting any individual or personal right of the relatrices in the $1000 they had advanced to the corporation in connection with the negotiation of the new lease, except such as they would have in their status as stockholders, the money to be treated as a corporate asset;

(5) holding the $2880.87 had been improperly transferred to the corporation's surplus, whereas it was due Madame Bernard personally; and requiring relatrix Harwood as secretary and treasurer of the corporation to countersign its check to Madame Bernard on the corporation's bank account for said amount;

(6) permanently restraining both relatrices from interferring with Madame Bernard's activities as president and general manager of the corporation;

(7) and decreeing that if relatrices failed to comply with the previous portions of the decree they should thereafter be forever enjoined and restrained from acting as stockholders, directors and

officers of the corporation; and in that event they should be deemed creditors of the corporation in the sum of $500 each, with interest at 6% per annum from September 1, 1940.

In their brief relatrices assail the above decree chiefly on legal grounds, namely, that the respondent judge was without jurisdiction: (1) to order cancellation of relatrices' two stock certificates for 100 shares each; (2) or to order the issuance of the corporation's 155 shares of treasury stock to the relatrices; (3) or to direct the disbursement of the corporation's funds (the $2880.87) to the plaintiff Madame Bernard in the equity suit—all this because the corporation was an indispensable party and was not joined as a party defendant in the equity suit. On these assignments relatrices cite a number of authorities listed below in the margin, to which we have added a few others.[1] Respondent's counsel answers that the corporation was not an indispensable party because its rights were not involved or affected by the cancellation of relatrices' two stock certificates, or the issuance of the treasury stock, and all the beneficial owners of the outstanding capital stock were in court. On these contentions respondent cites the authorities listed in the margin, to which we have added a few others.[2]

Relatrices go further and ask us to dispose of the entire case on the merits under the "clean hands" doctrine. And they cite several decisions[3] holding we have the discretionary power to do that in a prohibition proceeding. But if they are right in their first contention, that the respondent chancellor had no jurisdiction to render the decree below because the corporation was not joined as a party defendant, then we are unable to see how we can rule the case here on

---

[1] 18 C. J. S., p. 708, sec. 252(2); p. 1211, sec. 527; p. 1221, sec. 535; 14 C. J., p. 466, sec. 663; p. 467, sec. 664; p. 880, sec. 1341; p. 885, sec. 1340; Kendig v. Dean, 97 U. S. 423, 24 L. Ed. 1061; St. L. & S. F. Ry. Co. v. Wilson, 114 U. S. 60, 29 L. Ed. 66, 55 S. Ct. 738; Crump v. Thurber, 115 U. S. 56, 60(1), 29 L. Ed. 319, 5 S. Ct. 1113; Rogers v. Guaranty Trust Co., 53 Fed. (2d) 398, 399(1); Lucas v. Milliken, 139 Fed. 816, 823-5; Hyams v. Old Dominion Co., 204 Fed. 681, 685(4); ibid., 209 Fed. 808, 809; ibid., 113 Me. 337, 340, 93 Atl. 899, 901; Muellhaupt v. Jas. A. Strawbridge Est. Co., 136 Ore. 106, 298 Pac. 189, 193(1); H. M. Rowe Co. v. Rome, 159 Md. 599, 141 Atl. 334, 336(2); Bivens v. Hull, 58 Colo. 338, 145 Pac. 694, 695(1); Mtg. Land Inv. Co. v. McMains, 172 Minn. 110, 215 N. W. 192, 194(2); Campbell v. Morgan, 4 Ill. App. 100, 104-5(2); Dacovich v. Canizas, 152 Ala. 287(3), 44 So. 473; Red Bud Realty Co. v. South, 153 Ark. 380, 397(8), 241 S. W. 21; Ross v. Crockett, 9 La. Ann. 337; Price v. Minot, 107 Mass. 49, 63; Barbour v. Weld, 201 Mass. 513, 519-20, 87 N. E. 909.

[2] 18 C. J. S., p. 1220, sec. 535; 14 C. J., p. 885, sec. 1349; Behlow v. Fischer, 102 Cal. 208, 36 Pac. 509, 510(2); Doremus v. Nat'l. Cotton Imp. Co., 39 App. D. C. 295, 312(4); King v. Barnes, 109 N. Y. 267, 16 N. E. 332; Perkins v. Benguet Cons. Mining Co. (Cal. App.), 132 Pac. (2d) 70, 82-3(3-5).

[3] State ex rel. Mueller v. Wurdeman (Mo. banc), 232 S. W. 1002, 1004(4); State ex rel. Dunlap v. Higbee, 328 Mo. 1066, 43 S. W. (2d) 825, 826(2); State ex rel. Nickerson v. Rose, 351 Mo. 1198, 1202(2), 175 S. W. (2d) 768, 771(2).

its merits—unless we overrule that first contention. So we address ourselves to that.

■ The general doctrine stated in the texts and decisions cited in marginal note 1 is that while a corporation is not a necessary party to an equity suit between its stockholders where only their personal interests are in litigation and no corporate right is involved, yet the rule is otherwise where the rights of the corporation would be affected by the relief sought. However, some of the decisions cited hold that if a suit calls for *action* by the corporation, such as the transfer or cancellation of stock, then it is a necessary party because it is the *representative* of all its stockholders and has a right to control its records, whether it have a substantial interest in the controversy or not. See the Bivens, Mortgage Land Inv. Co. and Campbell cases. The Kendig case was much like the equity suit here. The Lucas case distinguishes the three United States Supreme Court decisions cited above, saying of them (italics ■ ours): "In all that line of cases where the corporation is held to be an indispensable party, either the principal relief sought is against the corporation for some wrong done by it, *or the action is for the purpose of having the ownership of the stock in question recognized by the corporation, and the stock transferred on its books.*"

■ We are convinced the Maison de Bernard corporation has substantial and not a mere formal or technical interest in the equity suit below, especially as regards its 155 shares of treasury stock. That stock belonged to the corporation,[4] and could be sold by it. In the equity suit Madame Bernard's contention was that she and the relatrices entered into an agreement in 1940 whereby she was to retain 300 shares of stock in the corporation and they were to receive 100 shares each. That necessarily involved the use of the 155 shares of treasury stock: either she would transfer 200 shares of her stock to relatrices and be reimbursed so far as possible from the treasury stock; or else the relatrices would get the 155 shares of treasury stock and 45 shares additional from her, as the respondent chancellor decreed.

In either event the treasury would be raided. Relatrices' stock, according to her version of the contract, was to be purchased for only $5 per share. The contract was between the parties as individuals. The corporation was not a party. Five years later she brought the equity suit to enforce that alleged contract by *mandatory injunction* against the other stockholders. At that time the stock had increased in value. The undisputed evidence was that relatrix Harwood had been offered $25 per share for her 100 shares of stock early in 1942; and by 1944 the net sales of the corporation had increased over

---

[4]18 C. J. S., p. 645, sec. 212; 14 C. J., p. 407, sec. 554; Maynard v. Doe Run Lead Co., 305 Mo. 356, 370(1), 265 S. W. 94, 97(2).

$30,000. After that favorable change in conditions Madame Bernard sought to enforce the contract of 1940 against the corporation by indirection. The integrity and assets of the corporation were involved, and so were the rights of its creditors.

At that time she was a minority stockholder on the corporation's records. It is argued by counsel for respondent—actually Madame Bernard's attorney in the equity suit—that because she made the other two stockholders (the relatrices) defendants in the equity suit, therefore all the real parties in interest were in court, and the corporation would be bound by the decree. But that is not the fact, nor is it the law. The stockholders, save in exceptional circumstances, cannot act for the corporation, individually or collectively, and especially where they are adversely interested.[5] The same is true of a director acting individually, even though he owns a majority of the corporate stock, Stevens Davis Co. v. Sids Petroleum Corp. (Mo. App.), 157 S. W. (2d) 246, 248-9(2)—a fact Madame Bernard must have realized in recognizing the power of the other two directors, (the relatrices) to outvote her on the amount of her salary. We think the petition in the equity suit and the decree based thereon were fatally defective jurisdictionally in attempting to bind the Maison de Bernard corporation although it was not joined as a party defendant.

The only remaining question is what disposition should we make of the case. Sec. 17 of the Civil Code[6] provides that misjoinder of parties is not a ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just. But that obviously refers to the trial court. Sec. 101 provides a dismissal without prejudice permits the party to bring another action for the same cause, unless the action is otherwise barred. Sec. 140 authorizes the appellate court to consider questions raised for the first time on appeal challenging the jurisdiction of the trial court over the subject matter and the sufficiency of the petition to state a claim on which relief can be granted. Undoubtedly the defect here comes within the latter specification. And relatrices' right to raise the foregoing questions is not disputed.

Sec. 140 further provides that the appellate court shall examine the transcript on appeal and, subject to the provisions above mentioned, shall: award a new trial or partial new trial; reverse or affirm the judgment or order of the trial court; or give such judgment as the trial court ought to have given agreeable to law. Continuing the

[5]18 C. J. S., p. 1171, sec. 495; 14 C. J., p.. 849, sec. 1291; 19 C. J. S., p. 471, secs. 1003, 1004; 14a C. J., p. 360, sec. 2222; 19 C. J. S., p. 472, sec. 1005; 14a C. J., p. 361, sec. 2223; 13 Am. Jur., p. 469, sec. 416; Jones v. Williams, 139 Mo. 1, 24(2), 39 S. W. 486, 489(2), 40 S. W. 353, 37 L. R. A. 682, 61 Am. St. Rep. 436.

[6]Laws Mo. 1943, p. 353, and same decimal section numbers added to Sec. 847, Mo., R. S. A.

section says that unless justice requires otherwise, the appellate court shall dispose finally of the case on appeal. Paragraph (d) of the section sanctions the dismissal of a case by the appellate court.

Strictly speaking, there may be some question as to whether this Sec. 140 applies to prohibition proceedings in the appellate courts, for while they are "appellate courts" in name and in fact, yet in prohibition proceedings they are exercising an original jurisdiction. But nevertheless it has been held in the Wurdeman and other cases cited supra, marginal note 3, that the appellate courts have discretionary power in prohibition proceedings to rule the cause on the merits—which makes them function *as* appellate courts to whatever extent they do that, and brings them within Sec. 140. And on the other hand, if that statute does not apply to appellate courts in prohibition proceedings, then they are left untrammeled by it. So, in either event we think we have power in this proceeding to direct what disposition should be made of the case.

The practice in the Federal courts in such instances as this is to reverse and remand with directions to dismiss the bill in equity without prejudice. The costs here probably will be considerable, as the bill of exceptions is long. It would be unjust merely to reverse and remand the cause, leaving the way open for the plaintiff to amend her petition in the trial court by adding the corporation as a party defendant—and let all the costs follow the outcome of another trial. Accordingly, the provisional rule is made absolute with directions to the respondent to dismiss the bill without prejudice, the costs of the proceeding below to be taxed against the plaintiff. All concur.